**In re LEDERMAN ENTERPRISES, INC., dba Regency Inn, Jakes, Inc., Stuff'd Shirt, London Grill, Dance Country Coffee Shop, Regency Park Hotel, Gatsby's Company, the International Club, Inc., Debtors.**

**Bankruptcy No. 87 B 10147 E.**

United States Bankruptcy Court,
D. Colorado.

April 20, 1989.

Lee Kutner, Rubner and Kutner, P.C., Denver, Colo., for debtors.

Andrew Petrie, Kirkland and Ellis, Denver, Colo., for Bankers Trust Co.

## OPINION AND ORDER ON FEES

CHARLES E. MATHESON, Chief Judge.

This matter is before the Court on the Application of Bankers Trust Company ("Bankers Trust") pursuant to the provisions of 11 U.S.C. § 506(b) for the allowance of "reasonable fees, costs or charges provided for under the agreement under which" the claim of Bankers Trust arose. Pursuant to the applications submitted, Bankers Trust seeks reimbursement for fees in the amount of $196,916.25, and out-of-pocket expenses in the amount of $31,917.34, paid by it to its attorneys, the law firm of Kirkland and Ellis ("K & E"); for out-of-pocket expenses incurred by Bankers Trust, primarily by way of travel expenses for its loan officer, Mr. David Wax ("Mr. Wax"), who was in charge of the loan, in the amount of $14,466.20, and for reimbursement of out-of-pocket expenses paid to Senior Corp. for travel expenses incurred in connection with consultations with Bankers Trust, in the amount of $3,193.06 (for a total out-of-pocket expense claim of $17,874.14); for the payment of fees and expenses for the appraiser hired by Bankers Trust in the aggregate amount of $52,525.01; and for the fees and expenses paid to Coopers & Lybrand for accounting services in the sum of $5,968.00. The aggregate recovery sought by Bankers Trust is in excess of $300,000.00.

The file reflects that Bankers Trust is a secured creditor of Lederman Enterprises, Inc., the Debtor ("Debtor"). The loan held by Bankers Trust was not originally made by that entity but was purchased by Bankers Trust from First of Denver Mortgage Investors, a lender based in Denver. The promissory notes which evidence the indebtedness owed by the Debtor to Bankers Trust specify, with respect to collection costs:

> Maker agrees to reimburse Holder for all reasonable costs, including attorneys fees incurred to collect this note or any installments if not paid when due.

In addition, the underlying deed of trust provides that the Debtor agrees

> 12. To pay promptly all reasonable costs, charges and expenses incurred by Beneficiary, including attorneys' fees arising out of or in connection with any action, proceeding or hearing, legal or otherwise, whether or not Beneficiary is a party, in any way affecting or relating to the Mortgaged Property, this Deed of Trust, or the aforesaid Promissory Note secured hereby.

The evidence has established that the total debt due Bankers Trust, exclusive of collection costs, was approximately $6,500,000.00 and that debt was secured by a first deed of trust against the Regency Hotel in Denver, Colorado. The opinion of Bankers Trust's appraiser was that the property had a value of at least $7.8 million dollars.[1] The Debtor's expert would have testified that the property was worth approximately $15 million dollars. Whichever appraisal is accepted, it is clear that Bankers Trust was more than adequately secured, which may account for the fact that at no time during the pendency of the action did Bankers Trust seek relief under section 362(d) of the Bankruptcy Code. Certainly, there is sufficient cushion that it is proper to allow fees and costs to Bankers Trust pursuant to 11 U.S.C. § 506(b).

As provided by the Code in section 506(b), fees and expenses are allowable, in the first instance, only to the extent provided for under the appropriate documents.

---

1. Arguments made by counsel at the close of the case indicate that there was an error in the Bankers Trust appraisal and that the original appraisal opinion was in fact amended to increase the same to approximately $8.8 million dollars.

That is a question which arises under state law. In general, Colorado has recognized the right of lenders to have reasonable costs and fees allowed in connection with foreclosure actions. In the case of *San Miguel Basin State Bank v. Oliver*, 748 P.2d 1342 (Colo.App.1987), the court held that the lender there was not entitled to include appraiser fees and costs as part of the collection costs. The court stated:

> We do not construe the language of the note, which obligated the grantors to pay all "reasonable ... costs ... in connection with ... the administration, supervision, preservation, protection of ... or the realization upon the collateral" to contemplate inclusion of the costs of appraisal of the property.... *Ibid.* at 1346.

■ In the instant case, the language of the deed of trust is much broader than that set forth in the *San Miguel* case. Here, the lender is entitled to be paid all reasonable costs, charges and expenses incurred in connection with any proceeding "in any way affecting or relating to the Mortgaged Property, this Deed of Trust or the ... Note secured hereby." For purposes of this bankruptcy proceeding, both in connection with cash collateral issues, the suit brought by the Debtor under section 105 of the Code, and the reorganization plan, it was necessary for Bankers Trust to be advised concerning the value of the property. The appraisal evidence was, in fact, directly presented at the hearings on the suit under section 105 of the Code. The Court finds, therefore, that reasonable appraisal fees would be properly allowable under the broad language of the Deed of Trust held by Bankers Trust.

In evaluating the Debtor's operations and evaluating the Plan, it would have been necessary to review and analyze financial statements, and evidence concerning these matters was in fact in issue in various hearings. Expert assistance from accountants would have been appropriate, and the Court concludes that reimbursement for accounting fees would also be allowable under the broad provisions of the Deed of

Trust. Obviously, the same conclusion applies to the allowance of attorneys' fees.

■ The Court has been provided with no authority for the suggestion that the out of pocket travel expenses incurred by Bankers Trust would be allowable as costs or expenses under the terms of the Deed of Trust, and this Court is not aware of the existence of any such authority. (To the contrary, see *In re Air Vermont, Inc.*, 40 B.R. 323 (Bankr.D.Vt.1984)). Traditionally, claims under the language such as that included in the deed of trust are limited to fees and expenses paid to third parties as opposed to the inhouse travel expenses of corporate officers, which generally constitute corporate overhead.

The Court's conclusion is further buttressed in this case by the fact that this was originally a Denver loan made by a Denver lender. Thus, there would have been nothing in the original transaction which would have alerted the borrower to the fact that it might be exposed to claims for thousands of dollars of travel expenses for a corporate officer of an out of state lender. Under the circumstances, the Court concludes that there is no basis for the allowance of out of pocket expenses for the travel expenses of Mr. Wax, and they are therefore denied.

■ As part of the application for the reimbursement of travel expenses, Bankers Trust has sought reimbursement of $3,193.06 for the travel expenses of Mr. Eisenman, a principal of Senior Corp., and Mr. Cast, an accountant for Senior Corp., who traveled to Colorado in August of 1987 to inspect the hotel property. The Court is unable to determine what role Senior Corp. played or what contribution it made in any way to the proceeding, and concludes that the application for reimbursement of those travel costs must similarly be denied.

There is a second step to the allowance of fees and expenses under section 506(b). Presuming that the documents provide a contractual basis for the allowance of fees and expenses, it remains the obligation of the bankruptcy court to determine whether the fees and expenses sought to be allowed are reasonable. The evaluation of the rea-

sonableness of the fees and expenses to be allowed is a question of Federal law. *United States v. Ron Pair Enterprises, Inc.,* — U.S. —, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re Neusteter Realty Co.,* 79 B.R. 30 (D.Colo.1987). In this District, pursuant to the decision of Judge Matsch in the *Neusteter* case, the Court must consider the standard set forth by the Tenth Circuit in *In the Matter of Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981). The Tenth Circuit, in turn, relied on the case of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). In that case the Fifth Circuit set forth a variety of factors which the court must consider in awarding fees. Those factors are:

1. The time and labor required.
2. The novelty and difficulty of the questions.
3. The skill requisite to perform the legal service properly.
4. The preclusion of other employment by the attorney due to acceptance of the case.
5. The customary fee.
6. Whether the fee is fixed or contingent.
7. Time limitations imposed by the client to the circumstances.
8. The amount involved and the results obtained.
9. The experience, reputation and ability of the attorneys.
10. The "undesirability" of the case.
11. The nature and length of the professional relationship with the client.
12. Awards in similar cases.

■ The application of the standards set forth in the *Johnson* case become more difficult when applied to a bankruptcy proceeding where there are a wide variety of issues arising. While the various factors enumerated in the *Johnson* case are certainly appropriate, the United States Supreme Court has recently affirmed its view that in awarding fees and in considering the *Johnson* standards, the Court should, in the first instance, be concerned with multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation. *Blanchard v. Bergeron,* — U.S. —, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). It is that standard which, therefore, must be addressed in determining the reasonableness of the request filed for the fees of the attorneys, the appraiser and the accountants.

■ The Court's analysis must start from the fact, as discussed above, that in light of the amount of the claim of Bankers Trust and the appraised value of the hotel pursuant to Bankers Trust's own appraiser, there was at no time in this bankruptcy proceeding any serious risk that Bankers Trust would not ultimately be paid all that it is owed. That is not to say that Bankers Trust did not have a legitimate interest in participating in the bankruptcy case. Unwarranted delays in moving forward with the plan of reorganization could have eroded property values. There would be continuing and accruing interest and charges against the loan, and the treatment of the Bankers Trust indebtedness under the Debtor's proposed plans of reorganization was certainly less favorable in the first instance than the lender might reasonably have requested. However, where a lender is assured of being repaid not only principal and interest but also all costs of collection which it might incur in chasing the debtor, there is a risk that the lender will permit or encourage its counsel to proceed with collection efforts with unbridled zeal. *See, In re Reposa,* 94 B.R. 257, 261–62 (Bankr.D.R.I.1988). The obligation of the Court under *Permian Anchor, supra,* and, pursuant to the mandate of the United States Supreme Court in the *Blanchard* case, *supra,* is to view what was done by the professionals, to make a determination of a reasonable number of hours for the services performed, and to determine a reasonable fee for such services.

The original fee application filed by Bankers Trust broke down the services performed by counsel in the following categories and amounts:

A. Pre-petition (primarily preparation of the foreclosure proceedings)—$10,-078.00

B. General Bankruptcy Representation —$104,605.00

C. Preparation of Creditor's Plan—$14,426.00

D. Defense of section 105 suit—$29,738.00

E. State Court collection suit against shareholders—$24,409.00

F. Preparation of Fee Application—$5,650.50

In addition there was unallocated time to October 20, 1988 of $1,141.25. Subsequent applications make claim for an additional amount in the approximate sum of $13,660.00. The aggregate amount ultimately sought is $196,916.25 in fees and $31,917.34 in expenses.

In performing the services Bankers Trust's counsel utilized an aggregate of seventeen people, comprised of five attorneys, four "librarians," four "clerical aides," three "project assistants," and one "legal assistant." Of the five attorneys who provided services, two were associates, each of whom had been admitted to the Bar in 1986 and whose hourly rates during the pendency of the proceeding ranged from $105 to $135 an hour. The remaining three attorneys had billing rates ranging from $155 to $250 an hour. The bulk of the time of the senior attorneys was expended by Mr. Petrie who was admitted to practice in 1981 and whose billing rate ranged from $155 an hour, as of July 1, 1987, to $180 a hour, as of January 1, 1988.

While the fee application allocates on a gross basis the amount of charges billed for the various overall categories of work, it is not possible for the Court to determine from the fee application with any degree of specificity the number of hours spent by any particular lawyer with respect to the particular work. In fact, during the pendency of the case, counsel for Bankers Trust did not keep time allocated to separate projects but billed all of their time to one generic category pertaining to the obligations of Lederman Enterprises. At the conclusion of the reorganization process, counsel then reviewed the total billings and made an arbitrary reallocation into the categories stated above. Bankers Trust's counsel also allocated the time of individual attorneys and assistants to the various projects. As of October 20, 1988, that time allocation for the attorneys, as set forth in the fee application, is as follows:

| Attorney | A Pre-Petn. | B General | C Creditor Plan | D 105 Suit | E Shrhldr Collection | F Fee App. | Total |
|---|---|---|---|---|---|---|---|
| Bennett | $ | $6,573 | $ 8,741 | $ | $ | $ | $15,314 |
| Pavek | | 30,671 | | 14,073 | 17,590 | 4,127 | 66,461 |
| Petrie | 814 | 49,982 | 2,070 | 12,671 | 4,501 | | 70,038 |
| Strahle | 4,070 | 1,336 | 3,240 | 1,860 | 290 | | 10,796 |
| Tudor | 3,910 | 8,628 | 375 | | | | 12,913 |
| TOTAL | $8,794 | $97,190 | $14,426 | $28,604 | $22,381 | $4,127 | $175,522 |

While the broad allocation of projects is of assistance to the Court, it is nonetheless difficult to deal with such things as the lumping of attorneys' time under "general" to the extent of $97,190.00.

In looking at the allocation of time by attorney, and in comparing that time to the services performed, it is apparent to the Court that the time allocated by the junior associates is excessive. It is not possible for the Court to detail each time entry and discuss the same. It is possible, however, to indicate by some general categories the degree to which the associates were turned loose on this project with apparently little or no supervision and left to bill the maximum possible amount that they might accomplish. For example, K & E expended an aggregate of just short of $30,000.00 in time in defending against the 105 Suit brought by the Debtor. In connection with that action, Mr. Pavek billed in excess of 67.5 hours on research pertaining to the 105 Suit and the standards applicable to

injunction hearings. The Court would venture that had Mr. Pavek spent an hour reading each significant case that has been reported under section 105 concerning enjoining officer/director suits, he could not have incurred that much time in general research in this area. Similarly, on March 9 and 10, 1988, Mr. Pavek spent 3.5 hours reviewing and responding to a motion which the Defendants had filed in the state court action seeking an additional amount of time to respond to Bankers Trust's motion for summary judgment. It is difficult for the Court to understand why Bankers Trust would fail to accord counsel for the Defendants with the simple professional courtesy of some additional time to respond to the motion. But, even assuming that there was a professionally justifiable basis for opposing the motion, it is inconceivable for an attorney to spend 3.5 hours drafting and preparing such a response. The Court also finds that in April and May 1988, Mr. Pavek spent in excess of 50 hours working on Bankers Trust's discovery responses to interrogatories propounded in the state court collection proceedings. Finally, there were also 10 hours recorded by Mr. Pavek in drafting objections to a rather nominal fee application of Mr. Polidori, an objection which was subsequently withdrawn.

With respect to Ms. Bennett, the Court notes that she is listed in the fee application as having as an area of practice "real estate." Nevertheless, to her fell the chore of drafting the proposed plan of reorganization which the creditors were considering filing. Preparation of a reorganization plan is a sophisticated matter, at best, in the hands of experienced bankruptcy counsel. In the hands of a junior associate trained in real estate, it is almost insurmountable.

The time expended by these two associates in the areas discussed is indicative of a mind-set by Bankers Trust and its counsel to leave no stone unturned and to pursue matters in the extreme, regardless of their merit or of the meaningful contribution such matters might bring to the ultimate collection of the debt owed.

By contrast, the Court finds that the time expended by Mr. Petrie was generally spent in an efficient manner (although not necessarily always upon fruitful matters.)

Apart from the analysis of the time spent by the individual attorneys, the Court must also focus on the time expended for the various categories of work. The Court's analysis by category is as follows:

■ 1. *Pre-petition.* In the fee application the pre-petition time is generally described as being the initial client contact time, together with the time spent in preparing the documents for foreclosure. The initial time was, in part, hand-holding time, particularly, it appears from the time records, the time expended by Mr. Tudor. The time expended by Mr. Strahle was primarily in connection with the foreclosure documents and documents pertaining to receivership. The preparation and filing of real estate foreclosure actions in Colorado are relatively *pro forma* matters commonly handled by paralegals. It involves the ordering and checking of the foreclosure certificate, the preparation of the notice of election and demand, the filing of the 120 applications and other related documents and, in this case, the commencement of the receivership action. Twenty-six hours of time spent on this project appears to the Court to be in excess of that reasonably necessary for a seasoned real estate attorney practicing in excess of eight years. Considering the role played by Mr. Tudor, and the aggregate time spent in these preliminary matters, the Court will reduce the fees allocable to this segment to an aggregate of $3,500.00.

■ 2. *General Post–Petition Representation.* This category of time includes a sweeping array of matters. It is not unreasonable for the Court to observe that Bankers Trust actively opposed virtually every meaningful, and some not so meaningful, application filed by the Debtor in this Chapter 11 proceeding. There were, for example, hotly contested proceedings concerning the use of cash collateral. The use of cash collateral in matters of this nature in this District, or at least before this Judge, have been very clearly delineat-

ed in this Court's opinion in *In re Morning Star Ranch Resorts,* 64 B.R. 818 (Bankr. Colo.1986). As articulated in *Morning Star,* the debtor-in-possession, once this case was filed, acted virtually in the guise of a state court receiver and was entitled to operate the hotel and use the proceeds derived to pay for the operating costs, including management costs, and to otherwise care for and maintain the property. Beyond that, the Debtor was entitled to use cash collateral provided the interests of Bankers Trust were adequately protected. As this Court has already observed, it is clear, and was clear even from Bankers Trust's own expert witness, that the interests of Bankers Trust were more than adequately protected, and there should have been little concern by Bankers Trust about the reasonable use of money to pay for operating expenses. Nonetheless, there were challenges to the amount of money being spent, challenges to the use of income to pay salaries of insiders (which challenges threatened to consume more in attorneys fees to argue than the amount that was paid to such insiders during the entire term of the reorganization), and other such disputes.

The disputes also spilled over to objections to applications filed by the Debtor to assume certain executory contracts that pertained to computer equipment and to time-keeping equipment. While it was ultimately established that, in point of fact, those contracts were not executory contracts but were security agreements, nevertheless remains clear that such items were necessary for the running of the business, whether it was done by this Debtor, or by a receiver appointed by Bankers Trust, or by Bankers Trust post-petition. Those matters tended to involve a nominal amount of money and were necessary and proper for the administration of the estate. The time spent by Bankers Trust in opposing them did nothing to enhance the proceeding, but added significantly to the administrative expenses for attorneys fees on both sides.

There were strong objections to the hiring of Mr. Polidori, primarily because Mr. Polidori was, at that time, defending one of the guarantors in the state court action. Nevertheless, the hiring in the bankruptcy case was merely to permit Mr. Polidori to continue going forward with some collection actions which he had instituted pre-petition for the Debtor. Those actions were calculated to bring funds into the estate on a direct basis, and there was no purpose to be served in disputing the status of Mr. Polidori to continue with that litigation. Indeed, to have refused to have hired Mr. Polidori would have been directly contrary to the best interest of this Debtor and, therefore, presumably contrary to the best interest of Bankers Trust.

Bankers Trust successfully objected to the application to assume the Best Western contract. While the objection was well taken, the Court cannot help but believe that, in the final analysis, the result was not in the best interest of the Debtor's estate, and the Court wonders truly what Bankers Trust was seeking to accomplish by way of the objection.

Bankers Trust filed extensive objections to the Debtor's disclosure statement, some nine pages in length. However, Bankers Trust, with its expensive appraiser and outside consultants and with the degree of discovery that it conducted in taking the depositions of principals of the Debtor, knew, probably better than the Debtor, all of the information that pertained to the Debtor's operations. As is often the case in Chapter 11 proceedings, the objections to the disclosure statement were proffered less for the purpose of enabling the Court to reach a conclusion as to whether there was adequate disclosure for the purposes of section 1125 of the Code, and more to further harass the Debtor.

There were, of course, objections interposed to confirmation of the plan. In those efforts Bankers Trust clearly sought to protect its interests against the plan which, due to its proposed treatment of the secured lenders, was of questionable confirmability. In this area, the efforts expended by counsel for Bankers Trust do fall within the meaning of the language of the Deed of Trust as being collection efforts, or ef-

forts to preserve and protect the lender's position on the property.

The ultimate problem in evaluating the fees sought in this general area is the fact that there are services aggregating in total charges in excess of $104,000 ($97,190 for the attorneys), which are not segregated in any manner. Thus, it is nearly impossible for the Court to determine how much time was in fact expended in the cash collateral matters, in objecting to the motions to assume contracts, in objections to executive compensation, in objections to the disclosure statement, or objections to the plan.

Considering the general excesses of time spent by Mr. Pavek in performing any services performed by him, the Court would reduce his time in this area by at least 50%. The time spent by Mr. Tudor appears to be mere surplusage and generally duplicative and will be denied. The charges of Ms. Bennett in this area should similarly be reduced by 50%.

Under the General classification Mr. Petrie billed $49,982 in time. The Court notes from the docket sheets in this case that the Debtor's plan of reorganization came on for hearing on July 27, 1988. The Court heard the matter for one day at that time and the case was continued to September 27, 1988, with the expectation that there would be two days of hearings. However, in the interim, the parties had resolved their differences and stipulated to a plan of reorganization.

The time records reflect that in July, 1988, Mr. Petrie billed an aggregate of $17,370.00. The time was primarily split between working on various aspects of the creditor's plan and working on preparation toward the hearings on the plan of reorganization. It would appear that Mr. Petrie spent approximately 75 hours in connection with the reorganization hearings at an aggregate of $13,500.00. Thereafter, in August and September, 1988, Mr. Petrie billed an additional $7,560.00, all or nearly all of which was attributable to negotiations and the ultimate resolution of the reorganization. That leads to a total of $21,060.00 on the plan confirmation matters.

The billings indicate that Mr. Petrie's efforts can be fairly generally split between the general maneuvering which was going on in the Chapter 11 prior to commencement of work in anticipation of the confirmation hearings, and the actual efforts in appearing at the confirmation hearings and negotiating the ultimate settlement. Thus, approximately $28,000.00 in time was spent on the pre-confirmation kinds of matters. Of course, some portion of that time was involved in reviewing the plan of reorganization, conversations with the client concerning the same, the development of information leading to objections to the plan, etc., but much of the time was spent in what the Court feels were generally unproductive and inappropriate areas in contesting matters purely for the sake of contest and without great expectation that the resolution of the matters in favor of Bankers Trust would either forward the reorganization process or would necessarily even be in the best long term interests of Bankers Trust. Such activities are consistent with the apparent view of Bankers Trust to waste no efforts in opposing the Debtor in these proceedings, without any economic restraint whatsoever because of the expectation that the Debtor would ultimately be made to foot the bill. As has already been observed, because of the way in which the billing records are presented, the Court is unable to extrapolate the time with any degree of accuracy. However, considering the number of matters in which Bankers Trust appeared, and considering the significant efforts put into all of these matters by Mr. Pavek, it is the Court's view that the reduction of the balance of Mr. Petrie's time by 50% would also be appropriate. Rounding these matters out, the Court would allow as reasonable compensation for the "General" bankruptcy services the sum of $53,000.00.

■ 3. *Creditors' Plan.* Time was spent by counsel for Bankers Trust in drafting a proposed plan to be filed by the creditors. That plan, and the accompanying disclosure statement, were never filed with the Court. The efforts with respect to that plan were being carried on in large

part contemporaneously with the preparation for and hearings on the Debtor's plan of reorganization. An aggregate of $15,000.00 was accrued with respect to this plan. Considering the secured posture of Bankers Trust, the plan proposals as put forth by the Debtor, and the ultimate settlements which were achieved, it is the Court's opinion that the time spent on the preparation of the creditors' plan may have been meaningful to Bankers Trust, but was not reasonably necessary for the protection of Bankers Trust's interests in the reorganization proceeding, and the Court will not allow any fees in connection with that effort.

■ 4. *Defense of 105 Suit.* Bankers Trust commenced a collection action in the state court against the individuals who had personally guaranteed the debt. That action encompassed both a suit on the guarantees and a suit to collect certain allegedly fraudulent transfer payments which had been made by the Debtor. The Debtor countered by filing an injunction action in the bankruptcy court seeking to restrain Bankers Trust from proceeding with the state court suit on the grounds that it would impair the reorganization.

It has been this Court's view that suits to restrain state court actions against officers and directors who have signed personal guarantees to the lenders are not only without merit, but are probably beyond the jurisdiction of this Court to entertain. The problem with such suits is fairly simple to explain. There is an inherent unfairness in restraining a bank from pursuing a suit on the guarantee while at the same time recognizing that the individual's other creditors (the dentist, the garageman, American Express, etc.) all will be able to press their claims. Further, while the bank is restrained, the individual is able to proceed with the dissipation of his assets. And if, in connection with the granting of an injunction under section 105, the court should impose the requirement for the posting of a bond to protect the bank against the individual's dissipation of assets, who will post that bond? It would appear to be improper for the debtor to utilize its assets to secure the interests of a corporate creditor as against its claims which might be made against the individual officer, director or shareholder. In short, in this Court's view, there is no justification for such suits. Nonetheless, such an action was commenced by the Debtor.[2]

The response of Bankers Trust was predictable. In a rather short period of time, it expended $30,000.00 in fees in defending against this suit. Mr. Pavek had 134 hours, of which this Court has already observed, 67.5 hours were spent in basic research. Mr. Petrie expended $12,671.00 in time.

This was a rather simple and straightforward injunction case. It was, unfortunately, heard by two different visiting judges. Nonetheless, in the Court's view, the attorneys for Bankers Trust, in preparing for and defending against the complaint, would have been required to file an answer and to appear at the injunction hearings which were held on two separate days. It should not have taken more than two hours of an attorney's time to file an answer to a complaint. Two trial days might consume 14 hours. The issues were really not exotic and, for experienced trial counsel such as Mr. Petrie, another 15 hours in trial preparation ought to have been more than enough. This estimate of hours is particularly acute and pertinent when viewed in the terms of the potential damage to Bankers Trust had the Debtor prevailed in the suit. Once again, the Court observes that Bankers Trust was more than adequately secured. The suit against the individual guarantors appears to have been generated more for the purpose of focusing pressure on the Debtor than on the expectation of immediate collection from the individuals. Once again, it is a question of whether Bankers Trust was reasonably seeking to protect its interests or acting without regard to the economic impact with the ex-

**2.** In the present case there was some justification in the 105 Suit because Bankers Trust had joined, in its suit in the state court, a fraudulent transfer claim which, if meritorius at all, clearly belonged to the Debtor. Thus Bankers Trust was enjoined from pursuing that claim.

pectation that the Debtor would foot the bill. Thirty-one hours of Mr. Petrie's time at his billing rate of $180.00 would result in fees of $5,580.00, a sum which this Court feels is more than adequate for reasonable fees in the defense of the 105 Suit.

■ 5. *Collection Action.* As noted, Bankers Trust commenced its separate collection action against the individuals. This was essentially a simple suit on a guaranty of a promissory note. It was complicated by the fact that Bankers Trust attempted to include claims in the complaint to recover fraudulent transfers which Judge Hill properly found, in the 105 Suit, that Bankers Trust had no standing to assert. Thus, to the extent that time was spent researching and working in this area, such time was improvident and not allowable.

■ The Court has previously observed the zeal of Mr. Pavek in this collection action, who spent 3.5 hours responding to a motion by the defendants for additional time to respond to a summary judgment motion. The billing time in this area is primarily Mr. Pavek's, who billed an aggregate of $17,590.00. There were problems brought on by the difficulty of serving process on one of the individual defendants. That, however, is a mechanical problem which should not have led to greatly increased attorneys fees.

The Court is left with the prospects of evaluating what would have been, in normal circumstances, reasonable efforts to sue on this guarantee. Absent the efforts to bring into the action the fraudulent transfer issues, the drafting of a complaint to recover on a guarantee ought to be a simple matter. Given notice pleading in the State of Colorado, it could virtually have been a one paragraph complaint. Discovery should also have been relatively straightforward, although without question the defendants would have been very aggressive in asserting their defenses. Nonetheless, the matter did move forward to resolution on summary judgment.

The Court finds it reasonable to expect that the drafting of the complaint to sue on the guarantees ought not to have taken more than two hours. Discovery, if not overdone, either by way of two relatively simple depositions or some straightforward interrogatories, ought not to have consumed more than another ten hours. Allowing for some slippage, an aggregate of 20 hours for such a collection case, billed at Mr. Petrie's rate of $180 per hour, would have constituted reasonable efforts towards the collection on the guarantees, and the Court will allow fees of $3,600.00 for these efforts.

■ 6. *Fee Application.* From the breakdown presented, it appears that there was ultimately an aggregate of approximately $15,000.00 in time expended on fee applications. The presentation of the fee applications, of course, required some investigation into what fees might be sought, the preparation of the applications and the presentation of the same. The Court is disinclined to give any credit for time spent in the presentation of fee applications for the out-of-pocket expenses for travel, etc. of Bankers Trust which the Court has disallowed.

Much of the time was spent in reviewing the billing sheets and attempting to recap the services in the various areas. This was brought on by the fact that counsel for Bankers Trust billed all of their time to one general account, as opposed to segregating the time as the services were provided. Counsel certainly should have anticipated the filing of a fee application and should have been aware that such an application would have required an allocation of time and billing. Had that been done and allocated on the computer, as is normal in these cases, the time required to assemble the fee application would have been relatively nominal.

An agreement was reached between counsel for Bankers Trust and counsel for the Debtor that no objections would be filed with respect to the fee applications of the parties. By agreement, the applications were to be filed, they would be deemed objected to, the parties would present such evidence as they deemed proper for the edification of the Court in support of their respective applications, and

the other party would not oppose the same. However, after Bankers Trust filed its application, suddenly there appeared an objection, quite obviously emanating from the typewriter of counsel for the Debtor, but nonetheless proffered through one of the shareholders by separate counsel. The existence of that objection caused counsel for Bankers Trust to have to present a more detailed case at trial than might otherwise have been anticipated.

It has been this Court's view that time spent in preparing, filing and presenting fee applications is time that can be compensable under the Bankruptcy Code. Certainly, pursuant to the terms of the Note and Deed of Trust, time spent collecting the collection costs would appear to be part of the collection costs themselves. It has generally been the policy of the Court, however, to allow fees in connection with fee applications at a reduced rate. Here, the fee application is extensive and the hearing on the fee applications extended over several hours. Discounting the time for that which was involved in presenting the application on behalf of Bankers Trust, and discounting the time further because of the hours that were required due to the failure of counsel to properly allocate time in the first instance, and reducing the time because of the nature of the service, the Court would reduce the fees for the presentation of and claim for the fees and costs to an aggregate of $4,000.00.

In reviewing the factors set forth in the *Johnson v. Georgia Highway Express* case, *supra*, the Court has, in general, already analyzed the time and labor required to provide the services. The questions presented in this case were, by and large, not exceedingly novel or difficult, but were comprised of the general kinds of questions that the Court and counsel would normally encounter in a contested Chapter 11 proceeding. Chapter 11 proceedings of this nature, however, are inherently not simple and require some specialized knowledge of the law. Thus, the case demanded skilled counsel to present the reorganization problems. The same cannot be said as to the collection suit, where the efforts of a collection attorney skilled in matters of that nature might have been more fruitful and performed at a much reduced charge. There is nothing to indicate in this case that the law firm was precluded from handling other clients except, perhaps, for Mr. Pavek who at times appeared to spend full time on this particular matter. It is fairly obvious from Mr. Petrie's billings that he came in and out of the case as the need arose.

The question of the customary fee and the experience, reputation and ability of the attorneys are related. These factors, in large part, relate to the billing rates. Considering the number and variety of fee applications which this Court sees, it is the Court's view that the billing rate of Mr. Petrie, considering his experience and his ability, was reasonable at $180 per hour. That his rate is high compared to the rate charged by Debtor's counsel may suggest that Debtor's counsel undercharged in this case. Nonetheless, the Court feels that Mr. Petrie's rate was acceptable. The rate charged for the younger, less experienced associates was, to put it kindly, aggressive. It is generally acceptable to bill a great many hours at a low rate or a few hours at a high rate. For younger associates, it is not acceptable to bill a lot of hours at a high rate. These factors have generally been taken into consideration by the Court in setting the fees.

The Court has commented on the aggressive posture taken by Bankers Trust in this proceeding. In fairness, the Court must also observe that the Debtor was similarly aggressive and litigious. The costs from such things as the 105 Suit and the diligent efforts of one of the defendants in the collection action to evade service of process added significantly to the time spent by counsel for Bankers Trust. The order of the day in this case on both sides seemed to be to proceed the hard way, if at all possible. Such tactics by the Debtor obviously served to increase the time spent by counsel for Bankers Trust, thus escalating the fees on both sides.

The amount involved and the results obtained must be balanced. Certainly there was a significant amount of money in-

volved. The interests of Bankers Trust in that money, as has appeared from the record, was rather comfortably protected. The ultimate result was a stipulated plan of reorganization. That stipulation ought to have been achievable without the spending by Bankers Trust of nearly $200,000.00 in attorneys fees. The fees determined above to be reasonable for the various categories of work are ample compensation in light of the results obtained. The Court, therefore, concludes that Bankers Trust is entitled to have allowed as a part of its claim reasonable attorneys' fees in the aggregate amount of $69,680.00.

In fixing the fees for the attorneys above, the Court did not separately focus on the billings by the various legal assistants. The Court has already observed that there were a great many involved in this case. Many of those assistants who were designated as "clerical" in nature, or "librarians," were fundamentally involved in normal overhead-type items and there are numerous entries in the time records concerning "filing," "organizing files," "obtaining copies," or "making copies," etc. The services provided by these "assistants" were taken into consideration by the Court in determining the total number of hours that ought to have been billed and allowed for fees by the law firm.

The application filed also contained an application for the allowance of out of pocket expenses for the attorneys in the amount of $31,917.34. Those expenses have not been broken down with respect to the various categories of services provided, other than in a pro rata amount. Those expenses include such things as "duplicating" for an aggregate of $7,542.00; "messenger" for an aggregate of $2,649.00; Federal Express charges of $1,351.00; overtime for secretaries and clerical help of $2,676.00; and, overtime meals of $75.00.

■ With respect to the overtime the testimony was that there was no effort to separately allocate the service. That is, if a secretary worked a regular work day on other matters, and then worked two hours in the evening on matters pertaining to this Debtor's estate, all of the overtime was billed to the Debtor.

Attorneys, in providing legal services, are expected to have available a staff sufficient to provide the services. If all of the secretary and clerical time is not billed to clients, it appears to the Court manifestly unjust that one client's account should be billed for all the overtime simply because the secretary happened to work on that matter after 5:00 p.m. as opposed to having worked on it prior to 5:00 p.m. and deferring the other matters until the evening hours. The Court concludes that, at least when handled in this manner, secretary overtime is an overhead expense that the law firm must absorb, and that would include the meals attributable to such time.

■ It is fashionable for counsel to utilize Federal Express to send pleadings and documents to clients. While there may be occasions where speed is critical, the utilization of special mail services is not justifiable as an expense of a debtor's estate when it is utilized in the ordinary course. The present case reflects regular monthly charges for Federal Express. There is no explanation as to why the utilization of Federal Express was necessary under all of those circumstances. In the absence of any specific showing for the need for such special handling, the application for Federal Express charges will not be allowed.

■ Similarly, there is no explanation as to the incurring of messenger charges to the extent of $2,649.00. Without some explanation as to why messengers were being utilized and why special charges were necessary, the application for the allowance of those expenses will not be allowed.

■ The application reflects aggregate charges for photocopies of $7,606.00. Such copies were charged at the rate of $0.15 a copy. Based on the billings made, that indicates an aggregate of some 50,000 copies of documents. This Court has been loath to impose stringent reporting requirements on copy expense, such as that as has been imposed by some other courts which require the applicant to identify each copy,

the reason it was made, the benefit to the estate, etc. The making of photocopies and the utilization of the same are simply facts of life in professional offices in this day and age. However, the Court has noted that, in its opinion, many of the objections and activities engaged in by Bankers Trust's attorneys in this case were unnecessary. Those activities generated pleadings and copies. The Court has reduced the attorneys' fees from that requested by approximately 65%. A similar reduction in the copy charges would be appropriate. Accordingly, the allowance for duplicating expenses will be reduced to $2,640.00.

■ Counsel's application also seeks reimbursement of expenses for such things as "miscellaneous office expenses," "entertainment" and "other" in the aggregate amount of $994.07. In order for this Court to determine whether expenses are reasonable or not, there must be some identification of the nature of the expense and the reason. Expenses in these random categories are simply not recoverable from the Debtor's estate, and expenses sought for those matters will be denied. The remaining expenses sought by the attorneys will be allowed in the aggregate amount of $19,370.27.

■ In addition to the fees for its attorneys, Bankers Trust also seeks reimbursement for the fees and costs it paid to the accounting firm of Coopers & Lybrand. It is represented that the accountants spent 22 hours of time at $240 per hour preparing to give expert testimony, providing accounting advice, reviewing background financial information concerning the Debtor, and attending various meetings with the Debtor to explore the financial information upon which the parties ultimately structured their settlement.

Once again, it is apparent that Bankers Trust went "First Class" in seeking accounting assistance, regardless of the economic risk involved in the case. No justification is offered for the use of a partner of a "Big Eight" accounting firm, with a billing rate of $240 per hour, for the services. The accountant was never actually called upon to testify concerning any expert opinions in the case; thus, the Court never had the opportunity to appraise the worth or ability of the accountant engaged to render an opinion. Neither is there anything in the application, nor in the summary billing statement provided, from which the Court can discern the nature of the services, the efficiency of the accountant, the need for the services, the reasonableness of the rate, nor the reasonableness of the ultimate fee charged. The burden is on the applicant to provide the Court with at least a threshold showing of facts from which the Court can make findings concerning the reasonableness of the fees charged. In the absence of such a showing the application for the reimbursement of fees for the accountants will be denied.

■ The remaining application before the Court is that for the allowance of the fees of the appraisers. Again, it is obvious that Bankers Trust went "First Class" without any degree of economic responsibility or control. The Court wonders if Bankers Trust, acting as a responsible client of professionals, would have accepted and paid bills of professionals for the services in these cases to such an extent as have been charged had Bankers Trust not been assured of recapturing some or all of such fees from the Debtor's estate. Bankers Trust's appraisers charged an aggregate of in excess of $50,000.00 for their appraisal fee and for coming to Denver for the appearance at one of the injunction hearings in the 105 Suit. By contrast, the Debtor's appraiser, whose qualifications are well known to this Court, provided the Debtor with an appraisal, and professional support for the appraisal, for a fee of $8,900.00. An appraisal fee of $50,000.00 on an $8,000,000 property which is an operating hotel and, therefore, not a unique parcel of land is, simply put, excessive. A reasonable appraisal could well have been obtained by Bankers Trust at the same rate paid for by the Debtor. The Court will, therefore, allow as part of the secured claim of Bankers Trust reimbursement for an appraisal to the extent of $9,000.00.

Having considered the applications presented and pursuant to the findings made herein,

IT IS THEREFORE ORDERED that the Court will allow to Bankers Trust Company, pursuant to the provisions of 11 U.S.C. § 506(b), reasonable fees, costs or charges in the aggregate amount of $98,050.27 for attorneys' fees and out-of-pocket costs, and the reasonable costs of an appraiser as herein determined.