**In re Donald William CUSHARD and Jeanette Cushard, Debtors.**

**Bankruptcy No. 98–30580–JWV.**

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

July 14, 1999.

Lynn M. Ewing, III, Nevada, MO, for debtors.

## MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

The MONY Life Insurance Company ("MONY"), an oversecured creditor of the Debtors in these converted Chapter 7 proceedings, has filed an application asking the Court to order the Trustee to pay MONY $27,883.51 in attorneys' fees and costs, pursuant to 11 U.S.C. § 506(b), out of the auction sale proceeds of the Debtors' dairy farm. The application was opposed by the Missouri Agricultural and Small Business Development Authority ("MASBDA"), which held a second mortgage behind MONY's first mortgage on the Debtors' property. The issue before the Court is whether the attorneys' fees incurred by MONY were reasonable and necessary under the circumstances of this case. For the most part, the Court finds that many of the actions taken by MONY's attorneys in this case were unnecessary and therefore that a substantial portion of the fees was unreasonable and unnecessary. The Court will allow MONY $8,265.00 in fees under § 506(b), and the balance of the fees that are found to be reasonable will be allowed as a general unsecured claim. MONY's request for recovery of its out-of-pocket costs and expenses and for default interest will be denied.[1]

## FINDINGS OF FACT

MONY's claim for attorneys' fees and expenses arises out of a first mortgage note which was secured by the Debtors' approximately 487–acre dairy farm in Vernon County, Missouri. The promissory note, executed by the Debtors in 1978, contained the following fee provision:

> "If this note is placed in the hands of an attorney for collection or is collected through any legal proceeding, the undersigned jointly and severally promise to pay, to the extent permitted by law, a reasonable attorney's fee, in no event to exceed 10% of the amount owing on this note."

The Debtors initiated these proceedings by filing an emergency Chapter 12 petition on June 29, 1998. The case was filed on an emergency basis because John Deere Credit, which held a chattel mortgage on a tractor owned by the Debtors, was threatening to repossess its collateral, which the Debtors apparently considered as being essential to their farming operations. As already noted, MONY's promissory note was secured by a first deed of trust on the Debtors' farm property. The Debtors, in their bankruptcy schedules, listed the amount of the debt owed MONY as $242,321.94, and they valued the farm at $500,000.00. MASBDA held a second deed of trust on the farm and was owed $117,720.07, and a third mortgage was held by Community National Bank with an amount owed of $78,797.62. The Court's files reflect that MONY took a very active interest and played a rather prominent role in all proceedings during the case, even though the validity and priority of MONY's first mortgage was never disputed or challenged by the Debtors or any other party in interest.

Very early on, United Missouri Bank ("UMB") filed an emergency motion to prohibit the Debtors' use of cash collateral.

---

1. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law as provided by Bankruptcy Rule 7052.

UMB had a perfected security interest in the Debtors' cattle and held an assignment of the Debtors' monthly milk checks. MONY asserted that it, too, held an assignment of the Debtors' milk checks, as well as a right to all income and profits from the Debtors' real estate, and therefore MONY filed an objection to the Debtors' use of cash collateral. The Debtors and the Chapter 12 Trustee disputed MONY's interest in the milk checks as collateral, and at a preliminary hearing on UMB's emergency motion, on August 14, 1998, counsel for MONY admitted that the milk check assignment had been unilaterally terminated by the Debtors and that, as a result, MONY no longer had a valid assignment in the milk checks. At the final hearing on UMB's motion, MONY still opposed the Debtors' use of cash collateral on grounds that the Debtors were not accounting for their post-petition income and that they were using cash collateral without permission. MONY took an active part in the final hearing on UMB's motion even though the cash collateral at issue was not property in which MONY had any security interest.

The Debtors filed a motion to convert their case from Chapter 12 to Chapter 11 on September 9, 1998,[2] and MONY filed its first motion for relief from the automatic stay on September 16, 1998. The Debtors and the Trustee objected to MONY's motion on grounds that there was a substantial equity cushion to protect MONY's interest in the property, the Trustee stating that the Debtors had testified at their § 341 meeting that the property could be worth as much as $750,000.00, substantially more than the $500,000.00 listed in their bankruptcy schedules.

On October 1, 1998, the Court entered its Order converting the Chapter 12 proceedings to Chapter 7 on the basis of a motion to convert filed by the Debtors on September 30.[3]

On October 7, 1998, the Court conducted a preliminary hearing by telephone conference call on MONY's motion for relief. Attorneys for MONY argued that MONY was at risk on its debt and first mortgage. The Court refused to lift the stay, and instead continued the stay until the final hearing set on October 22. On October 19, MONY withdrew its motion for relief without prejudice. Nevertheless, the Court conducted a hearing on the motion on October 22, and counsel for MONY attended that hearing even though he had withdrawn MONY's motion.

MONY then filed a second motion for relief from the automatic stay on January 7, 1999, and once again the Trustee opposed the motion on grounds that MONY had an equity cushion in the property. The Debtors also objected to the motion, arguing that the Trustee should be allowed time to sell the property so as to generate the best price obtainable. MASBDA also objected to this second motion, citing the equity cushion for MONY in the property and also noting the risk to junior lienholders that would result if MONY were granted the relief requested.

Shortly thereafter, on January 21, the Trustee filed notice of his intention to sell the Debtors' farm property, with all valid liens to attach to the proceeds. This notice of intent indicated that the Trustee intended to sell the property without reserve, meaning that it was his intention to accept the best offer without regard to whether it would pay the secured debts on the property or not.

MONY promptly filed an objection to the Trustee's notice of intent. It objected to the sale of the property without reserve and also objected to what it termed the Trustee's attempt to surcharge MONY's

---

**2.** This motion was opposed by John Deere Credit and was never ruled on.

**3.** This second conversion motion was, in all likelihood, brought about by the Court's ruling on September 29 prohibiting the Debtors' use of cash collateral and granting stay relief to UMB and Community National Bank.

collateral with the costs of the auction and the Trustee's fees "when the recognized beneficiaries of the auction process are the holders of junior liens and administrative claims ..." At a hearing on January 28, 1999, the Trustee agreed to not sell the property for less than an amount necessary to satisfy MONY's lien, and on that basis MONY withdrew its objections to the Trustee's plan to sell the property. The parties followed up this hearing with a Stipulated Order in which they agreed that the automatic stay could be lifted as to MONY, but MONY agreed to forbear on any foreclosure proceedings until April 15, 1999, so as to allow the Trustee to sell the property at an auction which was scheduled on March 30, 1999.

The Trustee did, in fact, sell the dairy farm at auction on March 30, 1999, for a sale price of $385,000.00.[4] Out of the proceeds of sale, the Trustee paid MONY $289,322.37, which paid the principal and interest owed on MONY's note, but did not pay any claimed attorneys' fees or expenses. The Stipulated Order had reserved that question for later determination.

Shortly thereafter, on May 5, 1999, MONY filed its Application asking that the Trustee be directed to pay MONY's attorneys' fees and costs in an amount of not less than $27,883.51 out of the auction sale proceeds, on grounds that MONY's note was oversecured and provided for the recovery of fees and expenses, as allowed by § 506(b). The Court conducted a hearing on June 24, 1999, on the Application and the objections filed by MASBDA. Subsequent to the hearing, the Court has reviewed the entire Court file and has reviewed in detail the itemization of legal services provided by MONY's attorneys in these bankruptcy proceedings.

## CONCLUSIONS OF LAW

A secured creditor's right to payment of attorneys' fees and expenses out of the funds of a bankruptcy estate is governed by 11 U.S.C. § 506(b).[5] That section allows reasonable fees and expenses to the extent that the value of the secured property, less any recovery by the trustee pursuant to 11 U.S.C. § 506(c), exceeds the amount of the secured claim, if such fees and expenses are provided for under the agreement giving rise to the secured claim. With respect to the issue of the reasonableness of attorneys' fees and expenses, the ultimate burden of persuasion is on the secured creditor seeking payment. *Matter of Kennedy Mortgage Co.*, 23 B.R. 466, 474 (Bankr.D.N.J.1982); *In re Minnesota Distillers, Inc.*, 45 B.R. 131, 134 (Bankr.D.Minn.1984). The reasonableness of the fees and expenses to be allowed is a question of federal law. *In re Lederman Enterprises, Inc.*, 106 B.R. 674, 678 (Bankr.D.Colo.1989).[6]

In determining the reasonableness of fees, the Court must undertake a two-part analysis. First, the Court must determine whether the *actions* taken by the creditor were reasonable and prudent in the circumstances. If the actions were not

---

**4.** The $385,000.00 was substantially below the Debtors' best-price prediction of $750,-000.00. The Trustee attributed the lack of bidding interest and the low price to the generally depressed farm economy.

**5.** Section 506(b) provides in full:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

**6.** There has been no suggestion that MONY's note was not "collected" as a result of the proceedings in this case. The Court believes that many of the actions taken by MONY were attempts to collect the money owed MONY, and in fact MONY did collect the full amount (principal and interest) of its note in these legal proceedings, so "collection" is not an issue. *Fundex Capital Corporation v. Balaber-Strauss (In re Tampa Chain Company, Inc.)*, 53 B.R. 772, 782 (Bankr.S.D.N.Y.1985).

reasonable and prudent, the fees should be disallowed. On the other hand, if the actions were reasonable and prudent, then the Court must determine whether the *itemized fees* are reasonable, and in that regard, the Court should consider the factors set out by the Eighth Circuit Court of Appeals in *Winter v. Cerro Gordo County Conservation Board,* 925 F.2d 1069, 1074, n. 8 (8th Cir.1991). *See also, In re Vista Foods USA, Inc.,* 234 B.R. 121, 132 (Bankr.W.D.Okla.1999) (applying 12–factor test in bankruptcy context). The Court will consider these two facets of the issue in turn.

### 1. Were MONY's actions reasonable?

■ Under § 506(b), attorneys' fees are reasonable only if they are incurred in protecting the creditor's rights in its collateral. *In re Brunel,* 54 B.R. 462, 464 (Bankr.D.Colo.1985). Fees for taking appropriate actions in a bankruptcy proceeding have been found to be reasonable where the mortgagee had been stymied by repeated bankruptcy filings in its efforts to collect the debt owed, *In re Melson,* 54 B.R. 47, 48 (Bankr.D.Del.1985); where there was a dispute regarding the value of the property and the creditor's interest in the property was in jeopardy, *In re Minnesota Distillers, Inc., supra;* and when the debtor has failed to comply with a confirmed plan of reorganization, *In re Calzaretta,* 35 B.R. 92 (Bankr.N.D.Ill. 1983).

There have been numerous cases in which the bankruptcy court allowed at least a portion of the fees sought even though the oversecured creditor did not obtain the precise relief requested. *See e.g., In re Minnesota Distillers, Inc., supra* (creditor oversecured by $600,000.00, motions for relief from stay and to prohibit further use of cash collateral denied, fees found to be reasonable because of confu-

sion as to true value of collateral and questions as to stability of creditor's secured status); *In re Masnorth Corp.,* 36 B.R. 335 (Bankr.N.D.Ga.1984) (equity cushion of $100,000.00, but creditor precluded by bankruptcy filing from accelerating debt and foreclosing on property).

■ In this Court's view, the key criterion in determining whether the fees incurred are reasonable is whether the creditor acted prudently under the circumstances in seeking to protect its interest in its collateral. *In re Brunel,* 54 B.R. at 465.[7]

■ In this case, the Court does not believe that many of the actions taken by attorneys for MONY were prudent or necessary for the protection of MONY's interest in the Debtors' property. As previously noted, the Debtors, in their bankruptcy schedules or otherwise, did not challenge the validity or priority of MONY's deed of trust. Nor did any other party contest it. The Debtors valued the property at $500,000.00 in their bankruptcy schedules, and MONY was owed less than $300,000.00 on its mortgage debt, thereby indicating that there was an equity cushion for MONY of at least $200,000.00. At the hearing on MONY's application, the Trustee indicated that he had had the property examined by others, if not appraised, and that there was a general consensus that the property had a value substantially in excess of the debt owed MONY. Therefore, as to value of the property and validity and priority of the debts, there was never any question raised that MONY was not only secured but was oversecured by a substantial margin.

Early in the case, there was no sound reason for MONY to object to the Debtors' use of cash collateral, because, as admitted by MONY at the preliminary hearing on August 14, the Debtors had terminated

---

7. It has been said that the standard of reasonableness to be applied pursuant to § 506(b) is that of "commercial reasonableness." *In re Minnesota Distillers, Inc.,* 45 B.R. at 135; *In re Hart Ski Manufacturing Co., Inc.,* 9 B.R.

397, 400 (Bankr.D.Minn.1981). That phrase has a nice ring to it, but it is not clearly defined in the opinions. This Court believes that "prudent" encompasses actions that are "commercially reasonable."

their assignment of their milk checks to MONY and therefore MONY had no interest in the cash collateral at issue. From the itemizations, it appears that MONY incurred at least $2,289.00 in attorneys' fees for this preliminary hearing alone, even though the hearing did not involve any collateral of MONY. Likewise, in view of the substantial equity cushion enjoyed by MONY in the Debtors' property, there was no strong justification for the filing of MONY's motion for stay relief in September 1998. Experienced bankruptcy counsel, such as MONY's counsel in this case, are aware that the bankruptcy courts seldom grant relief from the automatic stay early in a reorganization case when lifting the automatic stay would result in the foreclosure of the debtor's primary income-producing property. Perhaps MONY's counsel recognized the unlikelihood of obtaining the relief sought, because MONY withdrew its motion for relief before a final hearing could be held.[8]

Other examples of imprudent and unnecessary fees incurred prior to early 1999 include $902.00 in fees for an attorney from St. Louis to attend the § 341 meeting of creditors in Joplin (a 568–mile round-trip; local counsel could have covered the hearing for a fraction of this amount), $935.00 in fees for an associate to attend the Debtors' depositions in Ft. Scott, Kansas, $315.00 in fees for the lead attorney to review the deposition with the associate and report to the client, and $2,457.00 in fees for lead counsel to prepare for and participate in a hearing in Joplin on the use of cash collateral in September 1998 when MONY had no cash collateral in-

volved. These were simply unwise and unwarranted expenditures, in the Court's opinion.

In short, we are convinced that many of the services provided were simply not necessary either to the collection of or to protect MONY's interest in the collateral. MONY stood unchallenged at the head of the line with respect to the Debtors' real estate and was virtually assured (at least as assured as any first mortgageholder can be in a bankruptcy case) that its claim would be paid in full, including reasonable attorneys' fees. *In re Reposa,* 94 B.R. 257 (Bankr.D.R.I.1988). Many of the actions taken were not the kinds of actions that similarly situated creditors might reasonably have concluded should be taken under the circumstances here. *Dalessio v. Pauchon (In re Dalessio),* 74 B.R. 721, 723 (9th Cir. BAP 1987).[9]

The Court does, however, believe that a portion of the attorneys' fees incurred by MONY prior to January 1999 was justified, and so it will not disallow those fees entirely. MONY was not being paid any kind of adequate protection or other payments by the Debtors after their bankruptcy was filed in July 1998, and there was apparently a justifiable belief that the Debtors were improperly using the cash collateral of other creditors and not appropriately accounting for all income and expenses as they are required to do in a reorganization proceeding. MONY was obviously dissatisfied with the lack of payment on its note and with the Debtors' lack of progress in their reorganization proceeding. Therefore, while MONY's

---

8. The Court has noted several entries in MONY's counsel's itemization concerning hiring an appraiser and obtaining an appraisal of the Debtors' dairy farm property. It is not clear that an appraisal was ever obtained. If it was, the appraisal never made it to the Court. This suggests to the Court that MONY knew that it had an ample equity cushion that fully protected its interest in the property. Otherwise, if MONY had an appraisal that showed a lack of equity over the first mortgage, we can be assured that that evidence

would have been presented to the Court at some point during these proceedings.

9. "[W]here a lender is assured of being repaid not only principal and interest but also all costs of collection which it might incur in chasing the debtor, there is a risk that the lender will permit or encourage its counsel to proceed with collection efforts with unbridled zeal." *In re Lederman Enterprises, Inc.,* 106 B.R. at 679. Perhaps this is what occurred in this case.

status as a secured creditor may not actually have been in jeopardy prior to the filing of the Trustee's Notice of Intent in January, certainly MONY was prevented from proceeding against its collateral during the preceding six months, and that interest at least justified some of the actions taken by MONY's attorneys during that time. Also, it was appropriate for MONY's attorneys to monitor the case and be prepared to take appropriate and timely actions as the circumstances dictated. Accordingly, the Court will allow, pursuant to § 506(b), $2,000.00 of attorneys' fees for the period prior to January 1999. All other fees incurred during that period of time will be allowed only as a general unsecured claim.[10] *In re Hyer,* 171 B.R. 67, 71 (Bankr.W.D.Mo.1994).

## 2. Were the fees incurred after January 1, 1999, reasonable?

It is well established that the allowance of attorneys' fees is within the judicial discretion of the trial judge, who has close and intimate knowledge of the efforts expended and the value of the services rendered by the attorneys in the particular proceeding. *In re Harman Supermarket, Inc.,* 44 B.R. 918, 919 (Bankr. W.D.Va.1984) (citing *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir.1978)). In determining the amount of attorneys' fees to be awarded in cases of this sort, the Eighth Circuit Court of Appeals has adopted the following factors:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8)

the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Winter v. Cerro Gordo County Conservation Board,* 925 F.2d at 1074, n. 8 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 430, n. 3, 103 S.Ct. 1933, 1938, 76 L.Ed.2d 40 (1983)).[11] *See In re Vista Foods USA, Inc.,* 234 B.R. at 132; *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974).

The Court has reviewed MONY's request for fees and the attorneys' itemizations in light of these factors, but will not engage in an extended discussion of each individual factor as it applies to this case. Some general observations are appropriate, however. This proceeding, particularly as it concerned MONY, did not involve novel or difficult factual questions or legal issues. MONY had an unchallenged first mortgage on the Debtors' farm property, and the mortgage was substantially oversecured. It does not take a great deal of time, labor, research or ingenuity to file a motion for relief from the automatic stay or objections to a debtor's use of cash collateral in a reorganization proceeding. No extraordinary legal skills were required to properly perform the legal services that the attorneys here provided to MONY. Obviously, there was a substantial amount of money involved with respect to MONY's first mortgage, and the attorneys did eventually achieve the most favorable result possible, that is, full payment of the mortgage indebtedness out of the proceeds of sale of the property. From personal experience, the Court knows that lead counsel for MONY in this case is an expe-

---

10. After reducing lead counsel's fees to $175.00 per hour (which the Court, *infra,* determines to be a reasonable fee), the amount to be allowed as unsecured is $11,-452.50 for the period prior to January 1, 1999.

11. These factors are similar to the factors enumerated in the Rules of Professional Conduct adopted by the Missouri Supreme Court for the evaluation of the reasonableness of attorney's fees in the ethical context. Mo. Sup.Ct.R. 4–1.5.

rienced, reputable, and very capable bankruptcy attorney, but the attorney's representation of MONY in this case did not require extraordinary time and energy that would have prevented him from providing legal services to his other clients on a routine and timely basis. Finally, this was a relatively routine Chapter 12 proceeding that quickly converted to Chapter 7, and local counsel could have handled many of the routine matters for MONY at much less cost.

■ Having offered these criticisms, the Court nevertheless concludes that, for the most part, the legal fees incurred by MONY after January 1, 1999, were reasonable and appropriate to protect MONY's interest in the Debtors' property and to obtain full payment of the note. By early January, it had been over six months since MONY had received any mortgage payments. The Debtors' Chapter 12 case had been converted to a liquidation proceeding under Chapter 7, and further delays in liquidating the property would only increase the amount owed. Finally, the Trustee had placed MONY in some jeopardy by filing notice of his intention to sell the real property without reserve (though MONY could have protected its interest with a credit bid).

There are, however, two adjustments that must be made in the post-January 1, 1999, fees.

First, the Court notes that the fee charged by Mr. Goings, lead counsel for MONY, was $210.00 per hour. The Bankruptcy Courts in this District have previously established a customary fee standard of $125.00 per hour for attorneys involved in routine Chapter 7 and Chapter 13 cases. *See, e.g., In re Morrison,* 231 B.R. 754, 759 (Bankr.W.D.Mo.1999). Attorneys who are more experienced in reorganization cases in the Kansas City area—which is comparable to the St. Louis area—characteristically charge between $160.00 and $185.00 per hour for legal services rendered in connection with less complicated Chapter 11 and Chapter 12 cases. Mr. Goings' fee

of $210 .00 per hour is, therefore, not the customary fee allowed for attorneys in similar reorganization cases in this District. Accordingly, the amount that the Court will allow for the services provided by Mr. Goings will be limited to $175.00 per hour, and the fee application will be reduced accordingly. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984).

Secondly, there are two specific fees that the Court will disallow for services that were provided after January 1, 1999. For one, Mr. Goings charged MONY $1,575.00 for attending the Trustee's auction of the farm property on March 30, 1999. The Court believes that this fee expense was totally unnecessary; the Trustee had agreed not to sell the property for less than the amount owed MONY on its note and deed of trust, so there was absolutely no risk to MONY and no justification for Mr. Goings' attending the auction. MONY had previously argued that the "recognized beneficiaries" of the auction would be the junior lienholders and perhaps administrative expense claimants. For another, the Court will not allow $1,611.00 included in the itemization for the preparation of the fee application and activities associated with presenting the fee application to the Court. Preparing and presenting a fee application that was largely unwarranted is not an expense that should be borne by the Debtors or the junior lienholders.

■ As the court observed in *Matter of Nicfur–Cruz Realty Corp.,* 50 B.R. 162, 169 (Bankr.S.D.N.Y.1985):

"It is inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved."

In the present case, it will be the junior secured creditors, not the Debtors, who will be paying MONY's attorneys' fees.

Any amount paid to MONY out of the auction sales proceeds will reduce the amount available to pay to MASBDA and possibly Community National Bank, the junior lienholders. It would be inequitable and unjust to penalize the junior lienholders, in effect, by requiring them to pay attorneys' fees that were unreasonable and not justified in the circumstances.

Therefore, for the period after January 1, 1999, the court will allow, pursuant to § 506(b), the sum of $6,265.00 for the legal services provided by MONY's attorneys, and the balance of the fees for that period will be allowed as a general unsecured claim.[12]

Finally, the Court will not allow MONY's request for any expenses, the $15.00 requested as reimbursement for a wire transfer fee (presumably the fee incurred when the Trustee wired the payoff amount of $289,322.37 to MONY after the auction), and $215.85 sought for three days of default interest. With respect to the expenses sought, MONY's note did not provide for the recovery of expenses. It provided only for the recovery of attorneys' fees, and nothing further can be allowed under the note provision. As for the default interest, MONY never presented any evidence to the Court to support that claim, and therefore the request for $215.85 in default interest will be disallowed. The wire transfer fee is another expense that is not covered by the provisions of the note and is simply a cost of doing business, similar to postage and long distance telephone charges.

In summary, the Court finds as reasonable and will allow, pursuant to § 506(b), the sum of $2,000.00 for legal services provided by the attorneys to MONY prior to January 1, 1999, and the sum of $6,265.00 for legal fees incurred after January 1, 1999, for a total of $8,265.00 of § 506(b) fees. The Court will deny the request for all other fees and expenses

pursuant to § 506(b), and the remaining fees, in the amount of $15,791.50, will be allowed as a general unsecured claim. The Court will deny totally the request for costs and expenses, inasmuch as the note did not provide for their payment, and for default interest, inasmuch as no evidence was produced to support that request.

Accordingly, it is

**ORDERED** that the Application of The MONY Life Insurance Company for an award of attorney's fees and expenses pursuant to 11 U.S.C. § 506(b) is affirmed in part and denied in part, and the Objections to such Application filed by Missouri Agricultural and Small Business Development Authority are sustained in part and denied in part. It is

**FURTHER ORDERED** that The MONY Life Insurance Company shall receive, out of the sales proceeds of the Debtors' real property, the sum of $8,265.00 in attorneys' fees, as an oversecured creditor, pursuant to 11 U.S.C. § 506(b), and the Trustee is directed to make payment of said sum forthwith. It is

**FURTHER ORDERED** that The MONY Life Insurance Company be and is hereby allowed a general unsecured claim in these Chapter 7 proceedings in the sum of $15,791.50 for its attorneys' fees expended in these proceedings. It is

**FURTHER ORDERED** that The MONY Life Insurance Company's request for an award of its costs, expenses, and default interest pursuant to the provisions of its note be and is hereby denied.

**SO ORDERED.**

---

**12.** After reduction of Mr. Goings' hourly rate to $175.00, the unsecured amount allowed for the post-January 1, 1999, period is $4,339.00.

The hourly rates for Mr. Goings' associates have not been reduced.