**In re AUTOMOBILE WARRANTY CORPORATION, Employer's Tax I.D. 84–0675583, Debtor.**

**Bankruptcy No. 90–B–02815–A.**

United States Bankruptcy Court, D. Colorado.

May 14, 1991.

Joseph Rosania, Denver, Colo., for trustee, Andrea Berger.

Leo M. Weiss, Denver, Colo., for U.S. Trustee.

Glenn Merrick, David Garfield, Davis, Graham & Stubbs, Denver, Colo., for Davis, Graham & Stubbs.

Maria Flora, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., for Dependable Ins. Co., Inc.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court upon Davis, Graham and Stubbs' First Application for Interim Allowance and Payment of Professional Fees and Disbursements for Debtor's Counsel filed November 20, 1990. Dependable Insurance Co., Inc. and Dependable Warranty Co., Inc. (collectively "Dependable"), as well as the United States Trustee and the Chapter 7 Trustee, objected thereto. Applicant filed an Omni-

bus Response to the objections. A hearing was held on the matter. The Court, having reviewed the file and being advised in the premises, makes the following findings of fact and conclusions of law.

Briefly, the Court has reviewed the Application under its obligation to examine the propriety of fees and expenses. This Court concludes that the fees and costs requested must be reduced by the amount of $82,599.35 for the reasons set forth hereinbelow.

## I. BACKGROUND.[1]

Automobile Warranty Corporation ("AWC" or "Debtor") filed a Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on March 13, 1990. On March 16, 1990, Davis, Graham and Stubbs ("Applicant") filed an Application to be employed as attorney for Debtor. The Court authorized employment of Applicant on April 13, 1990. The Court also approved the $65,000.00 retainer previously provided Applicant by AWC.

Debtor propounded its First Joint Plan of Reorganization of Debtor and Insurance Specialists, Inc. and its first Disclosure Statement on October 26, 1990. On October 30, 1990, however, Dependable's Motion to Convert the case to a Chapter 7 was granted by the Court and Andrea Berger ("Berger") was appointed interim Chapter 7 Trustee.

Applicant filed a Motion to Withdraw on January 15, 1991. The Motion was granted on January 31, 1991.

The instant Application seeks interim compensation for the period of March 12, 1990 through October 31, 1990. Fees in the amount of $94,941.50 and expense reimbursement of $6,342.54, for a total request of $101,284.04, is sought thereby.

---

1. The Court observes, at the outset, that this case has a pervasive feature to it that necessarily affected the administration of the case, management of the estate, legal representation and, ultimately, approval of legal fees. That feature is the convoluted and complicated web of different interrelated businesses, interlocking directorates and/or management, transactions among entities, and financial and/or operational relationships between the Debtor and its plen-

tiful affiliates. The blend of interests and lines of authority were usually blurred, potential conflicts were present everywhere, and the real party whose rights and interests were being advanced during portions of the case was often open to question. A brief look at the businesses' organizational and management chart illustrates this well; a glance at Mr. Burtzos' positions and activities is also instructive.

## II. THE APPLICATION.

Dependable, the U.S. Trustee, and Ms. Berger objected to the Application on several bases. The Court will address the merit of each of the general categories of objections herein.

### A. *"Lumping."*

■ Applicant has consistently "lumped" or "clumped" all activities performed by a specific person on a given date under one block of time. While the descriptions are quite extensive,[2] no attempt was made to set forth, parenthetically or otherwise, the time expended on each *individual* task or categories of like or similarly related tasks. Applicant maintains that

> [s]imple common sense dictates that an attorney should not bill for each task.... Rather, the professional must use discretion and fundamental horse sense to group the tasks in a reasonable manner that will permit the Court to provide an adequate review. The daily time entries in the Fee Application are such an approach.

Omnibus Response, p.4 ¶ 14.

This Court does not agree.[3]

■ The Tenth Circuit has held that it is the responsibility of the party seeking fees to submit fee applications which enable the Court to make an informed determination concerning the reasonableness of the hours claimed and the nature of the services performed. *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983). *See also, Matter of Permian Anchor Services, Inc.*, 649 F.2d 763, 768 (10th Cir.1981) (adopting the 12 factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) including an examination of the reasonableness of time spent and the necessity of each service).

The first step in calculating fee awards is to determine the number of hours reasonably spent.... [Counsel] must keep meticulous, contemporaneous time records.... These records must reveal, for each lawyer ... **all hours for which compensation is requested and how those hours were allotted to specific tasks**.... The ... court should distinguish 'raw' time from ... 'billable' time.... [T]he amount of time actually expended [does not necessarily mean] the amount of time **reasonably** expended.

*Ramos v. Lamm, supra,* at 553 (emphasis added).

■ "Applicants may not circumvent the minimum time requirement or any of the requirements of detail by 'lumping' a bunch of activities into a single entry. [Citation omitted.] Each type of service should be listed with the corresponding specific time allotment." *In re Wildman*, 72 B.R. 700, 709 (Bankr.N.D.Ill.1987).

> ["Lumping" is a] practice universally disapproved by bankruptcy courts for two reasons. One, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable. Two, it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.

*In re Leonard Jed Co.*, 103 B.R. 706, 713 (Bankr.D.Md.1989).[4]

---

**2.** Indeed, some recitations of daily activities extend beyond one page. *See, e.g.,* Glenn Merrick's entries of April 23, 1990, June 12, 1990, July 3, 1990, July 10, 1990, July 16, 1990, July 24, 1990, July 25, 1990, September 24, 1990, September 28, 1990, October 1, 1990, and October 25, 1990 (all exceed one page).

**3.** This Court does not subscribe to a rigid requirement that counsel record, in a "minute and slavish" fashion, each and all fractional minutes and tasks. However, some reasonable and instructive allocation of tasks, time, and services, is required and that is not synonymous with "minute and slavish" recordkeeping.

**4.** The cases are legion in support. *See, e.g., In re Mortgage & Realty Trust*, 123 B.R. 626, 633 (Bankr.C.D.Cal.1991); *In re Alberto*, 121 B.R. 531, 536 (Bankr.N.D.Ill.1990); *In re Muir Training Technologies, Inc.*, 120 B.R. 154, 163 n. 3 (Bankr.S.D.Cal.1990); *In re New England Caterers, Inc.*, 115 B.R. 724, 728–729 (Bankr.D.Mass. 1989); *In re Great Sweats, Inc.*, 113 B.R. 240, 244, 244 n. 4 (Bankr.E.D.Va.1990) (cases cited); *Matter of Bilgutay*, 108 B.R. 333, 342 (Bankr. M.D.Fla.1989); *In re Kroh Brothers Development Co.*, 105 B.R. 515, 522 (Bankr.W.D.Mo.1989) (cases cited); *In re Lanier Spa, Inc.*, 99 B.R. 490, 492 (Bankr.N.D.Ga.1989); *In re Westside Creek*

Applicant contends that "[s]uch grouping is standard in the practice of law in this community."[5] Omnibus Response, p. 5 ¶ 18. "Lumping a day's activities in one entry may be an honest and complete summary but is of absolutely no value for any analytical purpose." *In re WHET, Inc.*, 58 B.R. 278, 280 (Bankr.D.Mass.1986).

The Court does not require a fee application the size of a boring victorian novel. However, in light of the fact that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors, the Court believes that a justification of such fees in the application for compensation is not an overly burdensome task.... The Court feels that the burden is on the attorney seeking compensation to establish the amount. The Court will not delve through the record of an extensive case, such as this one, in order to justify legal fees which counsel has not adequately documented in his application.

*In re Hotel Associates, Inc.*, 15 B.R. 487, 488 (Bankr.E.D.Pa.1981). *Accord, e.g., Matter of Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr.W.D.Pa.1986) ("This Court should not be required to guess the amount of time expended on each activity; neither should we be expected to indulge in extensive labor to justify a fee for an attorney who has not done so himself.")

This Court feels that disallowing clumping of time and requiring specificity and accountability in billing records and fee applications is *particularly important when, as here, attorneys are billing—and being paid—$150.00 to $200.00 per hour.*

It is, after all, not insignificant that this Circuit has held that *$150.00 per hour is a more than generous hourly fee. See, Smith v. Freeman*, 921 F.2d 1120 (10th Cir.1990).

The Court commends the amount of detail contained in the daily activity paragraphs. Such a practice, however, is permissible *only if* there is a designation, usually in parentheses, of the amount of time spent on each task or, at least, categories of like, or similarly related tasks. *See, Matter of Bilgutay*, 108 B.R. 333, 342 (Bankr.M.D.Fla.1989). Rather than totally disallow compensation for these services, this Court will reduce the requested fees by 10% across the board (or $9,494.15). Such a reduction is indeed generous in view of the standards set forth in the case law.

### B. *Travel Time.*

The U.S. Trustee questions the propriety of billing for Mr. Merrick's travel time to Florida. Applicant contends that Mr. Merrick flew cross-country at night after a full work day, conducted negotiations and attended conferences during the next day, and flew back at night. Applicant maintains that *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr.D.Colo. 1987), "unequivocally dictates that travel time may appropriately be billed at full rates." Omnibus Response, p. 6.

The fact is that business travel is seldom pleasurable. It is tiring, trying and dangerous. This is particular[ly] true when a cross-country flight takes place at night after a full day in court or in

*Limited Partnership*, 93 B.R. 177, 180 (Bankr. E.D.Ark.1988) (cases cited); *Matter of Pothoven*, 84 B.R. 579, 584, 589 (Bankr.S.D.Iowa 1988); *In re Wiedau's, Inc.*, 78 B.R. 904, 908 (Bankr. S.D.Ill.1987); *In re George Worthington Co.*, 76 B.R. 605, 608 (Bankr.N.D.Ohio 1987); *In re Pettibone Corp.*, 74 B.R. 293, 302 (Bankr.N.D.Ill. 1987); *In re Wildman*, 72 B.R. 700, 709 (Bankr. N.D.Ill.1987); *In re Paolino*, 71 B.R. 576, 581–582 (Bankr.E.D.Pa.1987); *In re Amatex Corp.*, 70 B.R. 624, 627 (Bankr.E.D.Pa.1985); *In re Taylor*, 66 B.R. 390, 395 (Bankr.W.D.Pa.1986); *Matter of Affinito & Son, Inc.*, 63 B.R. 495, 498–499 (Bankr.W.D.Pa.1986); *In re Esar Ventures*, 62 B.R. 204, 205 (Bankr.D.Hawaii 1986); *In re WHET, Inc.*, 58 B.R. 278, 280 (Bankr.D.Mass.

1986); *In re Tolan*, 41 B.R. 751, 756 n. 4 (Bankr. M.D.Tenn.1984); *In re Art Shirt Ltd., Inc.*, 30 B.R. 318, 322 (Bankr.E.D.Pa.1983) (cases cited); *In re Nation/Ruskin, Inc.*, 22 B.R. 207, 210 (Bankr.E.D.Pa.1982).

5. The Court disagrees, at least with respect to "standard in the practice of **bankruptcy** law in this community." **Bulk billing of blocks of time** in three, four, six, or ten hour increments, with no breakdown or differentiation between different tasks, or categories of tasks in that block of time, is simply not acceptable standard practice in this "bankruptcy law" community.

**78**

negotiations. It is not 'soft' time in this Court's view. *Frontier Airlines, supra* at 979. *Accord, Matter of Cano*, 122 B.R. 812, 814 (Bankr.N.D.Ga.1991).

■ This Court does not dispute that a certain amount of travel time is necessary, but it is rarely totally productive. Consequently, "it is unreasonable to tax the estate at the professional's full hourly rate for the time spent travelling. The professional can be reimbursed fully for expenses related to travel, but not for the actual travel time." *In re Microwave Products of America, Inc.*, 104 B.R. 900, 908 (Bankr. W.D.Tenn.1989). *Accord, Matter of Pothoven*, 84 B.R. 579, 585 (Bankr.S.D.Iowa 1988).

Courts have taken various approaches to the issue of compensating travel time. Some have allowed no compensation (*see, Jungkurth v. Eastern Financial Services, Inc.*, 87 B.R. 333, 337 (E.D.Pa.1988); *In re Seneca Oil Co.*, 65 B.R. 902, 909 (Bankr. W.D.Okla.1986)), others have allowed compensation at 50% of the normal rate (*see, In re Robertson Companies, Inc.*, 123 B.R. 616, 621 (Bankr.D.N.D.1990); *In re Landing, Inc.*, 122 B.R. 701, 704 (Bankr. N.D.Ohio 1990); *Matter of Environmental Waste Control*, 122 B.R. 341 (Bankr. N.D.Ind.1990); *Matter of Pothoven, supra* at 585; *In re Taylor*, 66 B.R. 390, 397 (Bankr.W.D.Pa.1986); *In re WHET, Inc.*, 61 B.R. 709, 712 (Bankr.D.Mass.1986); *In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436, 443 (Bankr.E.D.N.C.1984)), 75% of the normal rate (*see, In re C & J Oil Co., Inc.*, 81 B.R. 398, 404 (Bankr.W.D.Va. 1987)), 100% of the normal rate (*see, Frontier Airlines, supra* at 977) or a flat hourly rate throughout the jurisdiction (*see, In re Sinor*, 87 B.R. 620, 622 (Bankr.E.D.Cal. 1988) ($50.00 per hour); *In re Amatex Corp.*, 70 B.R. 624, 627 (Bankr.E.D.Pa. 1985) ($40.00 per hour)). This Court believes that it is inappropriate to bill unproductive time at a full hourly rate. In view of the holdings of the cases cited, allowing travel time to be billed at one-half the normal hourly rate is "more than charitable." *Taylor, supra*, at 397. Accordingly,

the fee request will be reduced by $840.00 (8 hours × $210/hour × 50%).

C. *Clerical/Ministerial Tasks.*

■ "Several courts distinguish 'truly legal services' from 'ministerial tasks' and either disallow or reduce rates accordingly." *In re Seneca Oil Co.*, 65 B.R. 902, 910–911 (Bankr.W.D.Okla.1986) (cases cited).

> Where a court chooses to delineate between ministerial and legal tasks it necessarily directs the manner in which attorneys manage their firms. Such delineation would encumber daily management decisions concerning the activities attorneys will pursue. It also requires attorneys to assign personnel to tasks based on some imposed job description rather than the efficacies and urgencies of the situation. This is beyond the court's duty to assure reasonable fees. We feel it is best to leave managerial decisions to the law firms ... unless the allocation is egregious.

*Id.*, at 911.

Compensating mixed legal and ministerial services, that is, telephone calls and correspondence, at a lower rate than "truly legal services," such as litigation, research and document drafting, creates "an unwarranted distinction which is contrary to the fundamental notion that counsel should be encouraged to resolve matters informally whenever possible in order to avoid costly litigation." *In re Pettibone Corp.*, 74 B.R. 293, 304 (Bankr.N.D.Ill.1987). *Accord, Pothoven, supra* at 585–586.

■ This argument does not hold true, however, when a firm routinely utilizes legal employees to perform tasks of a purely non-legal nature, such as filing papers with the Court. Such services "should *not* be compensable at the hourly billing rate of an attorney when such ministerial and routine tasks can be performed by less-costly non-legal employees." *Amatex, supra* at 627 (emphasis added). *Accord, In re Paolino*, 71 B.R. 576, 582 n. 6 (Bankr.E.D.Pa.1987).

The instant Application contains several instances where the legal staff has billed for tasks which are of a purely ministerial

nature.[6] Accordingly, this Court will reduce the amount of fees requested by $600.00.

### D. Excess Time/Duplication of Effort.

The U.S. Supreme Court has stated that attorneys applying to a court for statutory attorney's fees

[S]hould make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting. It is no less important here.'

*Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct.1933, 1939–1940 [76 L.Ed.2d 40] (1983), quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980).

The standard of Bankruptcy Code § 330 that compensation be for actual and necessary services makes the exercise of such 'billing judgment' a **mandatory requirement** in bankruptcy fee matters. A debtor's estate should not bear the burden of a duplication of services, and such duplication should be avoided by counsel on their own initiative by exercise of good 'billing judgment.' If found in the record, duplication shall be disallowed by the court as unnecessary.

*Pettibone Corp., supra* at 303 (cases cited) (emphasis added). *Accord*, [*In re*] *Jensen–Farley Pictures, supra* [47 B.R. 557] at 583. [(Bankr.D.Utah 1985)]

In order to clearly demonstrate that the appropriate billing judgment has indeed been exercised, this Court "suggests that all time expended on matters before the court be set forth in the application but that time not included in the fee calculation (i.e. 'written off') be specially designated and explained." *Pettibone Corp., supra* at 304 (cases cited). *Accord, Jensen–Farley Pictures, supra* at 583 n. 30 (cases cited). Although testimony adduced at trial alleged that some hours were "written off," the time records submitted to the Court contain no indication of such a practice. Without some documentary evidence of billing judgment, it must be inferred to have been, at best, minimally utilized. This Court must, therefore, carefully scrutinize the billing statements to deduce any "excessive, redundant or otherwise unnecessary" time. *Hensley v. Eckerhart, supra* 461 U.S. at 434, 103 S.Ct. at 1939–1940.

Billed and paid attendance by two or more attorneys at meetings, hearings, conferences and so forth is not unexpected or improper, if circumstances warrant same. However, it must be minimized and restrained whenever possible. Given the nature of this Chapter 11, the issues involved, and the case administration, this Court believes that too much billed and "paid" attendance by multiple attorneys is present. This Court, in its review of the billing statements attached to the Application, has discovered *numerous* instances where each participant involved in an inter-office conference has billed therefor[7] or

---

**6.** Denise Dougherty expended 5.5 hours at $70.00 per hour (May 21, 1990 through June 21, 1990) arranging for service of process in Florida. Ms. Dougherty also spent one-half an hour on September 7, 1990 to "[a]ssist T. Bell with witness and exhibit lists; travel to bankruptcy Court and file same" as well as one-half an hour on October 11, 1990 to "[t]ravel to Bankruptcy Court to obtain hearing date on Motion to Dismiss or Convert Chapter 11 case; confer with T. Bell concerning same."

Thomas Bell billed 2.8 hours (at $85.00 per hour) on July 31, 1990 to "[p]repare Certificate of Service re: Preliminary Hearing on Joint Motion for Relief from Stay; telephone call with F. Burtzos concerning same." On September 10, 1990, Mr. Bell billed a portion of his

time to "[p]repare Certificate of Service for proposed list of exhibits and witnesses."

Glenn Merrick charged a portion of his time on June 19, 1990, September 19, 1990, and September 20, 1990, for "arranging for filing and service of Motion and Rule 23 Notice to settle claims with K. Robinson," "telephone call to Judge Brooks' secretary regarding same," and "telecopy drafts to J. Stevenson" respectively.

**7.** Duplicate inter-office conferences include the following: March 15, 1990 (Merrick and Bell); March 22, 1990 (Merrick and Bell); April 9, 1990 (Merrick and Garfield); April 10, 1990 (Bell and Garfield); April 16, 1990 (Merrick, Bell and Garfield); April 17, 1990 (Merrick and Garfield); May 4, 1990 (Merrick and Garfield); May 7, 1990 (Merrick and Garfield; Merrick,

where more than one attorney has billed for their attendance at hearings.[8] There is *clearly* duplicative billing without sufficient justification being presented to the Court; it is noncompensable. This Court will reduce the requested fees by $2,000.00 to account for the apparent duplication.[9] *See, e.g., Pettibone Corp., supra* at 303 (cases cited).

Additionally, the U.S. Trustee alleges that Applicant spent excessive time on privilege-related issues, plan preparation, Mr. Burtzos' employment application, and "simple" research.

■■■■■ Applicant claims to have spent over $12,150.00 in fees on discovery and other privilege-related issues. This Court agrees with the U.S. Trustee that the time spent was excessive in light of the mandates of bankruptcy law. The management of the Debtor was obligated to act as a fiduciary for the estate's creditors. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 354–356, 105 S.Ct. 1986, 1994–1995, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 649–652, 83 S.Ct. 969, 979–981, 10 L.Ed.2d 33 (1963). Management was obligated by the Code to exercise its discretion for the primary benefit of these creditors and not primarily for the interests of the shareholders. Such vigorous assertion of the attorney-client and work product privileges as was seen in this case is diametrically inconsistent with these fiduciary duties. *See, Commodity Futures Trading Comm'n v. Weintraub, supra* 471 U.S. at 352–355, 105 S.Ct. at 1993–1994. This Court, however, will not completely eliminate all fees requested in this area, because a certain amount of document work would have been necessary even if all of the requests had been complied with immediately without objection. This Court will reduce the fees requested by $6,000.00.

■■■■ Similarly, over $4,833.06 was requested for plan preparation. This plan and disclosure statement was filed merely days prior to the hearing on the Motion to Convert. The plan, *on its face,* was not confirmable. Apparently, no legal research was done which would have revealed its fatal flaw, or it may have been performed and then disregarded in Debtor's rush to file a plan. *See, e.g., In re Highway Truck Drivers & Helpers, Teamsters Local No. 107,* 100 B.R. 209 (Bankr. E.D.Pa.1989). The plan was, therefore, not filed with a real sense of confidence that it was feasible. This Court cannot award

---

Bell and Garfield); May 15, 1990 (Merrick and Bell); May 17, 1990 (Merrick and Garfield); May 18, 1990 (Garfield and Dougherty; Merrick and Garfield); May 23, 1990 (Bell and Garfield); June 4, 1990 (Garfield and Dougherty); June 7, 1990 (Merrick and Garfield); June 8, 1990 (Merrick and Garfield); June 12, 1990 (Merrick, Garfield and Dougherty); June 15, 1990 (Merrick and Garfield); June 18, 1990 (Merrick and Garfield); June 19, 1990 (Bell and Garfield); June 25, 1990 (Merrick, Bell and Garfield); July 9, 1990 (Merrick, Bell and Garfield); July 10, 1990 (Merrick and Bell); July 19, 1990 (Merrick and Bell); August 6, 1990 (Merrick and Garfield); August 10, 1990 (Bell and Dougherty); August 15, 1990 (Merrick and Bell); August 20, 1990 (Merrick and Bell); September 4, 1990 (Merrick and Garfield); September 6, 1990 (Merrick and Bell); September 13, 1990 (Merrick and Bell); September 25, 1990 (Merrick and Garfield); September 28, 1990 (Merrick and Bell); October 1, 1990 (Merrick and Bell); October 4, 1990 (Merrick and Bell); October 5, 1990 (Merrick and Garfield); October 12, 1990 (Bell and Garfield); October 15, 1990 (Merrick and Garfield); October 24, 1990 (Merrick, Bell and Garfield); October 25, 1990 (Merrick and Bell); October 26, 1990 (Merrick, Bell and Garfield); October 29, 1990 (Merrick and Garfield); and October 31, 1990 (Merrick and Bell).

**8.** Duplicate attendance at hearings are exemplified by the August 21, 1990 entry by both Merrick and Bell.

Other examples of duplicative billings include the following: March 12, 1990 (Merrick and Bell met with Board of Directors); April 12, 1990 (both Bell and Garfield went to the offices of the Debtor to review documents); April 18, 1990 (Merrick, Bell and Garfield involved in telephone conference); July 5, 1990 (Vicky Vuletich and Bell attended a meeting); August 30, 1990 (Dougherty's efforts appear to be purely duplicative of her own August 27, 1990 actions); September 4, 1990 (Merrick and Garfield involved in telephone conference); and September 21, 1990 (Merrick and Bell involved in telephone conference).

**9.** This Court surmises that some, if not much, of the duplication might arise from the complex web of affiliated businesses, principals, and transactions, between and among Debtor's many associated entities.

such last minute, ill-founded, essentially valueless services which double as delay tactics. None of these fees will be allowed.

■ Mr. Burtzos' employment application was essentially unnecessary since he was general counsel, an officer and a director of the Debtor, and a chief executive officer. 11 U.S.C. § 327(b). This Court calculates that about $850.00 in fees is attributable to this issue and cannot be allowed.

■ Finally, this Court agrees that Applicant spent too many hours on some research topics. "[T]ime spent on legal research is not always necessary and compensable. Counsel are presumed to be sufficiently experienced and to have an adequate background in the applicable law. [Cite omitted.] This court does recognize that particular questions requiring research will arise and, where adequately documented, will be fully compensable." *Pothoven, supra* at 585. *Accord, In re Lederman Enterprises, Inc.,* 106 B.R. 674, 684–685 (Bankr.D.Colo.1989); *Wildman, supra* at 710 (cases cited). This Court is particularly concerned with the amount of time spent researching issues related to the Motion to Convert and will reduce the fee request by $1,000.00.

E. *No Benefit to Debtor/Conflicts of Interest.*

The objecting parties argue that this Court should deny *all* of the fees requested by Applicant due to lack of benefit, numerous entanglements and extensive conflicts of interest. This Court acknowledges that this case, as a Chapter 11, embodied and relied for its success, almost exclusively on the outcome of certain litigation. While litigation may form the basis of a Chapter 11 case, the proponents must be more careful and advance the case with cautious recognition of its vulnerability. Applicant contends that Chapter 11 was chosen instead of Chapter 7 because it felt that Debtor was in a better position to pursue the litigation than a Chapter 7 trustee. Additionally, Applicant decided that it was proper and necessary to undertake certain efforts which were either not beneficial to

anyone but the affiliates or only marginally beneficial to the estate. These were judgment calls which ultimately proved to be unsubstantiated.

■ The Court must not, however, rely upon perfect hindsight and must err on the side of allowing fees. Although the Court deems it to be unreasonable to deny the requested fees because of errors in judgment, this case was pursued too long, too far, and apparently without sufficient thought or the exercise of professional judgment. There comes a time when an attorney has the duty to advise his debtor/client that the case no longer holds any prospect of success and that it should "throw in the towel." *See, In re Pacific Forest Industries, Inc.,* 95 B.R. 740, 744 (Bankr.C.D.Cal.1989) (attorneys are to "carefully monitor each case and encourage conversion or dismissal without delay when it becomes apparent that reorganization is no longer feasible or that wrongdoing is taking place.").

■ The paramount consideration in reviewing the reasonableness of fees is the result achieved or the benefit conferred.

Neither the size of the file nor the hours spent have a pervasive bearing on this aspect of the inquiry. While it is true that under the Code attorneys in bankruptcy practice are to be compensated at a rate commensurate with other fields of practice, such does not amount to a guarantee nor should it mean that compensation in bankruptcy cases should be awarded irrespective of the result.... If results were not given primary emphasis then there would be a proclivity on the part of professionals to engage in unwarranted and protracted work with the expectation of being compensated no matter how ineffective or unwarranted the endeavor.

*In re Garnas,* 40 B.R. 140, 142 (Bankr. D.N.D.1984).

■ Applicant requests $5,787.00 for "Settlement Negotiations with Dependa-

ble."[10] Many of these settlement negotiations took place in Florida. No explanation is given as to why these discussions could not have been undertaken over the telephone. Moreover, it is readily admitted that "the parties were ultimately unable to reach mutually agreeable terms of settlement." Application, p. 3. This Court finds that the estate received very little, if any, benefit from these negotiations and will reduce the fees requested by $3,000.00.

■ Some $34,838.55 is requested for efforts relating to "The 'Malpractice Suit'" currently pending before the U.S. District Court for the District of Colorado. The Court questions why so much time was necessary on a claimed "slam-dunk" and an apparently straightforward case.[11] The interests of the estate may or may not have been advanced to some degree by these efforts, but this Court cannot properly assess the quality and value of the work and the benefit to the estate until a final resolution is reached and the Court can more fully and accurately measure the worth of counsel's services. The Court, therefore, cannot allow the $34,838.55 until such time.

Applicant requests $13,818.38 relating to "The 'Texas Suit.'"[12] Applicant filed a motion seeking determination that the automatic stay contained in 11 U.S.C. § 362(a) applied to stay these proceedings. A settlement agreement was rejected by this Court as premature. These efforts were of no benefit to the estate. Instead, the estate was sapped of funds. This category is a dramatic illustration of an evident conflict of interest; a conscious effort which this Court construes to be of benefit to Debtor's closely-related affiliates sometimes more than the Debtor itself. The Court will not allow the $13,818.38 requested.

Finally, Applicant requests $4,510.11 for "The Corporate Administrative Services, Inc. Arbitration." Applicant acted jointly with Warranty Administration Corporation ("WAC") to obtain a Bankruptcy Court determination that the automatic stay did not apply to the arbitration proceedings between WAC and Corporate Administrative Services, Inc. ("CAS"), an affiliate of Debtor. This was purely a matter between WAC and CAS and did not, directly or indirectly, affect Debtor. This Court will not allow the $4,510.11 requested as it represents yet another example of the divided loyalties and conflict of interest of Applicant.

In summary, this Court will allow fees of $13,157.25 at this time.

### F. *Expense Items.*

The Application itemizes $6,342.54 in expenses which may be summarized as follows:

| | |
|---|---|
| Copies | $2,517.05 |
| Long Distance Telephone/ Telecopy Charges | $ 472.21 |
| Courier Charges: | |
| General | $ 243.15 |
| to Bankruptcy Court | $ 82.00 |
| to District Court | $ 25.00 |
| Special Postage | $ 109.16 |
| Westlaw Charges | $1,063.29 |
| Filing Fees | $ 180.00 |
| Index Tabs | $ 6.50 |
| Service of Process Charges | $ 196.00 |
| Secretarial Overtime | $ 60.75[13] |
| Travel Expenses | $1,110.93 |
| Transcript Charges | $ 276.50 |
| Total Expenses | $6,342.54 |

10. Dependable obtained a prepetition judgment in an amount exceeding $5,400,000.00 in a Florida State Court against AWC.

11. The defendants therein, law firms and attorneys, were censured in Florida for their activities.

12. Debtor is one of several defendants in an action by Kim Robinson in the U.S. District Court for the Southern District of Texas on alter ego claims.

13. The request for reimbursement of secretarial overtime was subsequently withdrawn as more properly included in overhead. *Accord, In re Leonard Jed Co.,* 118 B.R. 339, 342 (Bankr.D.Md. 1990) ("in the absence of some compelling reason ... what reason is there to charge a client merely because routine services were rendered after normal business hours?"); *In re Lederman Enterprises,* 106 B.R. 674, 687 (Bankr.D.Colo. 1989); *In re Convent Guardian Corp.,* 103 B.R. 937, 941 (Bankr.N.D.Ill.1989); *In re Island Helicopter Corp.,* 53 B.R. 71, 73 (Bankr.E.D.N.Y. 1985).

 The Court firmly believes professionals are entitled to reimbursement of all *reasonable* out-of-pocket expenses. *See, In re Kreidle*, 85 B.R. 573, 575 (Bankr. D.Colo.1988) (cases cited). Such costs must be viewed critically to ascertain that each item is indeed reasonable. "General descriptions of expense items will suffice but extraordinary expenses (e.g., copying and mailing of the plan) should be specifically set forth, with ... sufficient information for the court to ascertain the necessity and reasonableness of each item." *Seneca Oil, supra* at 912.[14]

 This Court believes that photocopying "at rates comparable to rates charged by commercial copy shops in the area is obviously reasonable." *Id. See also, In re Island Helicopter Corp.*, 53 B.R. 71, 73 (Bankr.E.D.N.Y.1985) (the amount charged to other clients is not probative of the actual cost). The Application does not state how many copies were made or at what rate they were charged. The Court cannot, therefore, specifically find that the expense is reasonable. The amount requested, however, does not appear to be unusually high for such a case as this. The Court will, with some hesitancy, allow reimbursement of this expense.

 Applicant contends that it has attempted to utilize the least expensive forms of delivery but that "on occasion" time constraints have required overnight or hand-delivery of documents. This Court believes that while such delivery methods are a "necessity at times, [they] should be used sparingly. Deadlines should be anticipated so that filings and other papers can be sent through regular mail." *Environmental Waste Control, supra* at 349. *Accord, In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 834 (Bankr.D.Vt.1987) (the burden is on the applicant to establish that the less expensive alternative was *properly* rejected; attorney procrastination is insufficient); *In re First Software Corp.*, 79 B.R.

108, 120 (Bankr.D.Mass.1987) (emergencies only). There must be an explanation as to why the utilization of such special delivery was necessary. Absent any specific showing of need, the expense cannot be allowed. *Accord, In re Heck's, Inc.*, 112 B.R. 775, 804 n. 86 (Bankr.S.D.W.V.1990); *Lederman Enterprises, supra* at 687. The Court has not been provided adequate explanation for the necessity of these charges in order to determine their reasonableness. Accordingly, this Court will allow only $200.00 of the $350.15 requested for various courier charges.

 Similarly, computer-assisted legal expenses may be compensable where they are both necessary and attributable to a particular client. Ideally, the billing statements should indicate the date, the person conducting the search, the length of the search, as well as providing evidence of the necessity for the use of the service. It has been held:

> [That the] purpose of computer research is to cut down the amount of time necessary to research a particular issue, not to increase the costs. The same amount of research [could] have been ... done with digest books in the same amount of time ... and at no extra cost to the estates. [Unless] some showing is ... made that the use of computers to research cut down the total time necessary to research a particular issue, the Court will be inclined to find that the expense of computer research is not necessary.

*Wildman, supra* at 732.

Time savings can be established by describing to the Court the issue being researched. If the issue is sophisticated, and not "learning time" better obtained by using more conventional or routine methods, the charges will be compensable. *Accord, In re Wizard Enterprises, Inc.*, 109 B.R. 708, 710 (Bankr.W.D.La.1990).

 The Court has reviewed the breakdown of computer research time in conjunc-

**14.** This Court notes, however, that "we cannot agree with the corollary of several [cases] that otherwise non-allowable costs can be allowed when the firm requesting same is either extremely persistent or painstaking in documenta-

tion of such items ... even though such documentation is always appreciated." *In re National Paragon Corp.*, 68 B.R. 337, 343 (Bankr. E.D.Pa.1986).

tion with the time entries on the billing statements. Only eight of the 24 individual computer research charges match up to corresponding time entries which even mention that any type of legal research was conducted.[15] *No* entry specifically mentions that the research was computer-assisted. Applicant maintains that computer services were used only when expeditious. This Court, however, cannot allow such an expense when there is not even a bare reference in the time records that research of any kind was conducted. Accordingly, this Court will allow only $465.59 of the $1,063.29 requested for this expense.

 Of the remaining expenses, only "Index Tabs" must be disallowed. The $6.50 charge is more properly attributable to overhead absent a showing that the expense in this case is truly "extraordinary."

To summarize, the Court will allow the following expenses:

| | |
|---|---|
| Copies | $2,517.05 |
| Long Distance Telephone/ Telecopy Charges | $ 472.21 |
| Courier Charges | $ 200.00 |
| Special Postage | $ 109.16 |
| Westlaw Charges | $ 465.59 |
| Filing Fees | $ 180.00 |
| Index Tabs | $ 0.00 |
| Service of Process Charges | $ 196.00 |
| Secretarial Overtime | $ 0.00 |
| Travel Expenses | $1,110.93 |
| Transcript Charges | $ 276.50 |
| | |
| Total Expenses | $5,527.44 |

### III. THE RETAINER.

Applicant requests an order from this Court directing that it be paid by the estate the amount of its claim allowed herein. Applicant's claim, however, is subordinate to all Chapter 7 administrative expenses. If this Court were to order payment as Applicant requests, substantially all of the liquid assets of the estate would be depleted. This Court will not order payment of the claim established hereby until either the Chapter 7 Trustee's Final Report is approved or Ms. Berger notifies this Court that she has sufficient funds in her possession to pay all anticipated Chapter 7 and Chapter 11 administrative expenses, whichever event occurs first.

Further, this Court believes that the $65,000.00 retainer currently held by Applicant is property of the estate and may be subject to recovery by the Chapter 7 Trustee to pay any claims having priority over Applicant's claim as established hereby. *See, e.g., In re Kinderhaus Corp.*, 58 B.R. 94, 97 (Bankr.D.Minn.1986).

Accordingly, it is hereby

ORDERED that Davis, Graham & Stubbs is allowed a claim for interim fees in the amount of $13,157.25 and interim expense reimbursement in the amount of $5,527.44 for a total of $18,684.69; and it is

FURTHER ORDERED that this claim, being subordinate to all Chapter 7 administrative expenses, may not be paid until further order of this Court.

---

**15.** These entries are Mr. Bell's entries for April 10, 1990, April 11, 1990, April 12, 1990, April 18, 1990, July 18, 1990, September 28, 1990 and October 3, 1990, and Ms. Benavidez's entry of July 17, 1990.