**In re Jan Douglas and Caryn Lea WANECHEK, Debtors.**

No. 03–05590–JAR12.

United States Bankruptcy Court, E.D. Washington.

Sept. 14, 2006.

James P. Hurley, Hurley, Lara & Hehir, Yakima, WA, for Debtors.

## MEMORANDUM OPINION

JOHN A. ROSSMEISSL, Bankruptcy Judge.

Jan and Caryn Wanechek (Debtors) operated a mink farm. They filed a Chapter 12 case and confirmed a liquidating plan. Pursuant to this plan the Debtors' property was sold. American Legend Cooperative (ALC) is an oversecured creditor of the Debtors which seeks an allowance of its attorneys fees and costs pursuant to 11 U.S.C. § 506(b). The Debtors, the Chapter 12 Trustee, and the Internal Revenue Service (IRS) object to the allowance of the fees claimed as unreasonable.

### I. *Jurisdiction*

The issues in this matter "arise under" and "arise in" a case under Title 11. 28 U.S.C. § 157(a). The United States District court for the Eastern District of Washington has referred these matters to this court. Local Rules U.S. District Court Eastern District of Washington LR 83.5 § 1.01. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A) "matters concerning the administration of the estate; (B) allowance or disallowance of claims . . .; and (O) affecting the liquidation of assets and adjustment of the debtor creditor relationship."

### II. *Procedural History*

This court pursuant to the terms of the Debtors confirmed plan, authorized the sale of the Debtors' real estate. This sale yielded roughly $365,000 net for the estate. The proceeds of this sale, after payment for costs, were to be distributed first to the secured claims of American West Bank and ALC, and then to the priority claim of the IRS. The trustee paid to American West Bank and ALC the principal amount of their obligations plus interest, leaving a balance of approximately $84,779.75 to be distributed to American West Bank and ALC for their respective attorneys fees and costs and the balance to the IRS. American West Bank sought $23,114.63 for its costs and attorneys fees while ALC claimed $43,112.98 for its attorney fees and costs. The IRS claim against these funds was $93,000.00. The funds available were insufficient to pay all these claimants.

On January 31, 2006 the IRS, American West Bank and ALC filed a "Joint Motion for Order Approving Disbursement of Net Proceeds of Sale". They proposed that the remaining balance of sale proceeds $84,779.75 be distributed as follows:

| | |
|---|---|
| a. American West Bank | $19,115.00 |
| b. American Legend | $24,113.00 |
| c. IRS | $41,551.75 |

This proposed order was duly noticed.

A timely objection was filed by the Debtors asserting that American Legends claim for attorneys fees and costs was not reasonable or necessary. ALC filed a response to Debtors' objection which indicated that it had incurred approximately $43,112.98 fees as of the date of the hearing. It indicated that it was willing to accept the $24,196.00 "to achieve a consensual resolution with American West Bank and the IRS, the only remaining secured creditors." The response also challenged the Debtors standing to raise an objection. On February 28, 2006, a hearing was conducted upon the joint motion for disbursement of sales funds. In light of the Debtors' objection the matter was continued, however an order was entered on the same date authorizing disbursement to American West Bank of the sum of $19,198.00[1] for its attorneys fees and costs and satisfying its claim.

---

1. The difference in this amount from the amount in the joint motion is interest received by the trustee.

Prior to the continued hearing ALC filed an application for fees and costs which sought an award of $30,000.00 fees plus costs, and supported its motion with inclusion of the itemized attorney time sheets. This motion for allowance of attorneys fees and costs pursuant to 11 U.S.C. § 506(b) was objected to by the Debtors, IRS, and the Chapter 12 Trustee. A hearing was conducted on ALC's application. Although the parties were given an opportunity to have an evidentiary hearing, they chose to rely on the written submissions and oral argument.

### III. *Standing*

■ The Debtors, the IRS and the Chapter 12 Trustee have standing to challenge the reasonableness of fees charged against property of the estate. The IRS is to receive the balance remaining after payment of the fees of ALC. The obligation to the IRS is not dischargeable and accordingly debtors may be liable for any deficiency in payment to the IRS.

### IV. *Facts*

The issue in this matter is the reasonableness of an oversecured creditor's claim for attorneys fees and costs incurred during the course of a three year Chapter 12 case. Given the nature of the dispute it is necessary to review the significant events in that history.

Jan Douglas Wanechek and Caryn Lea Wanechek, husband and wife, operated a mink raising business known as Wanechek Mink Ranch. In the course of their business they borrowed money from ALC. These loans were evidenced by revolving notes and secured by the Debtors' real estate and personal property. The obligation was substantial, approximately $350,000.00 in early 2003. The business was not successful and the Debtors decided to liquidate their mink inventory. By the date of their bankruptcy they had reduced their obligation to ALC to roughly $48,000.00.

This debt was secured by a second deed of trust on the Debtors' real estate behind a first mortgage in favor of American West Bank, and a security interest in the Debtors' equipment, inventory and other personal property. There were extensive mink sheds located on the real estate.

On July 1, 2003, the Debtors filed their petition for relief under Chapter 12 of the Bankruptcy Code. The Debtors' schedules reflect an undisputed debt to ALC of $48,142.09. This obligation is secured by real estate valued at $307,770.00, farm equipment and fixtures valued at $19,635.00, for total collateral securing ALC debt of $327,405.00. The schedules also reflect another lien in favor of American West Bank against Debtors' real estate in the amount of $156,565.00. This lien was prior to that of ALC, leaving an equity in Debtor's real estate of $151,215.00 to secure ALC debt of $48,142.09.

ALC filed its first claim in this matter on August 22, 2003. This claim was in the amount of $48,521.40 and secured by real estate, motor vehicles, machinery, equipment, animals, farm products, etc., as provided in the attached security agreement. As to value of collateral, the claim stated "believe to be well in excess of claim." Thus the Debtors' schedules and the claim are essentially in agreement as to ALC's status in the bankruptcy.

During this early stage of the case, ALC was represented by the law firm of Lane Powell Spears Lubersky LLP. It filed an appearance in this case, represented ALC at the first meeting of creditors, and prepared ALC's first claim.

In November of 2003, the Chapter 12 Trustee filed a motion to dismiss the Debtors' case for failure to timely file a plan.

The Debtors responded by filing their first Plan on November 21, 2003. In this plan, Debtors proposed to pay ALC's claim with interest at seven (7%) percent over 15 years at $400.00 per month. The Debtors used the amount shown in ALC's claim $48,521.40 as the amount of their obligation to ALC. ALC was to retain its lien on the real property. The Debtors revealed in this plan that they had ceased mink breeding and they did not intend to reenter the market. The Debtors intended to execute their plan by other farming activities, non-farm income and liquidation of surplus farm equipment.

ALC objected to Debtors' first plan and filed a motion to dismiss the case. It asserted that Debtors' plan understated the amount of its claim and ignored its lien on the Debtors' equipment. Also ALC objected to having its debt paid over a term of 15 years. Finally it alleged that the Debtors were not engaged in a "farming operation" and thus not eligible for Chapter 12 relief, and in any event, there was no chance of rehabilitation.

A hearing was held on February 9, 2004 on ALC's motion to dismiss. This was the first court hearing. At this hearing the court was advised that Debtors were working on a liquidation plan and that ALC was striking the hearing on its motion to dismiss. Upon the agreement of the parties, the court directed the Debtors to file a marketing plan and continued the matter.

On July 23, 2004 the Debtors filed their Plan. This was a liquidation plan which proposed to sell the real estate by private sale within two years of the Plan's confirmation, or failing that, sale at public auction. ALC objected to the terms of the First Amended Plan asserting that two years was too long a period to market the property and suggested immediate sale of the personal property.

A hearing on confirmation of the Debtors' Second Plan was delayed while the parties negotiated the terms under which the real estate would be sold. During this time the marketing process was delayed by substantial problems. The numerous structures, 1500 mink pens, had to be removed. Also an environmental impact statement had to be prepared before the property could be marketed. American West Bank and its attorney took the laboring oar in facilitating the accomplishment of this work. Ultimately on February 3, 2005, American West Bank sought and received a first priority security interest for funds it advanced to remove the existing structures on the land and obtain the requisite environmental clearances.

Shortly thereafter on March 14, 2005, Lane Powell withdrew and Dorsey Whitney appeared as counsel for ALC. The reasons for this change of counsel has not been disclosed.

On April 28, 2005, the Debtors filed their Third Plan. This Plan stated that the secured creditors had agreed on a marketing plan which provided that the real estate would be sold by the end of 2005. After a number of continuances and adjustments of terms, this Third Plan was confirmed on September 1, 2005. By the terms of the confirmed plan, the property was sold at auction by the Trustee on October 19, 2005, which sale was approved by the court on November 8, 2005.

After payment of all principal and interest to American West Bank and ALC, there remained a balance to be distributed to American West Bank and ALC for their attorneys fees and costs with the remainder of the sales proceeds to be paid to the IRS on its priority claim. These parties noticed a stipulated order that ultimately proposed payments of $19,115.00 to American West Bank for attorneys fees,

$24,113.00 to ALC for attorneys fees and the balance of $41,551.75 to the IRS.

The Debtors objected to ALC's proof of claim as it related to its attorneys fees. The parties stipulated and the court approved payment to American West Bank of the sum of $19,198.00. The Chapter 12 Trustee and the IRS joined the Debtors in objecting to ALC's attorney fees. In light of these objections, ALC abandoned the compromise proposal and sought an allowance of $30,000.00 for its attorney fees.

At the time of hearing, the court suggested an evidentiary hearing would be necessary to resolve the reasonableness of ALC's fees requested, now $30,000.00. ALC through its counsel, asked the court to resolve the matter without an evidentiary hearing, with the court considering the written materials submitted.

### V. *Analysis*

#### A. *ALC's Claim and Fee Request.*

The Debtors scheduled their debt to ALC at $48,142.09, secured by collateral valued at $327,405.00. Of this collateral $307,770.00 was real estate, on which ALC was in second priority behind a first mortgage in favor of American West Bank securing a debt of $156,565.00. ALC's first proof of claim in this case stated its secured claim was $48,521.40, secured by real estate and personal property collateral whose value was "believed to be well in excess of claim." Debtors adopted ALC's figures in this initial proof of claim and relied on those through confirmation of their plan and sale of the real estate. There has been no dispute about the amount, priority or secured status of ALC's debt from the time of filing its original proof of claim on August 22, 2003 to the time it sought payment of its attorneys fees in late 2005.

After the sale of the Debtors' real estate for $430,00.00 on November 21, 2005, ALC filed a second proof of claim. This proof of claim indicated that $45,521.40 was due ALC at the time the case was filed, that the claim was secured by real estate valued at $430,000.00 and that the total amount of the secured claim was $89,968.38 as of November 18, 2005. The accounting attached to this second proof of claim shows that ALC had incurred charges totaling $31,273.78 for attorneys fees. Of this sum $26,680.78 was incurred prior to March 14, 2005 (the date the Dorsey firm substituted as counsel for Lane Powell), and $4,593.00 after that date.

On December 19, 2005, ALC filed a third claim in the amount of $93,113.28. It reflects $48,521.40 principal, $8,272.57 interest through December 7, 2005, and $35,851.71 of attorneys fees through December 7, 2005. Of the total of fees claimed, $28,297.18 was incurred prior to March 14, 2005 and $7,554.53 thereafter. The Dorsey firm billed an additional $12,010.50 for work performed during the months of December 2005 through February 28, 2006.

ALC's attorneys collectively have charged it, based on the documents submitted to the court, at least $47,862.21 as of February 28, 2006. Presumably additional work was performed between the end of February 2006 and the hearing date. The total fees charged ALC through February 2006 are approaching the total amount of the original claim $48,521.40 as of the date of filing. It is unknown what amount ALC has actually paid its attorneys for the services performed.

ALC agreed with American West Bank and the IRS that it would receive $24,113.00 of the sale proceeds in satisfaction of its claim for attorneys fees and costs. When this compromise was noticed to the creditors, Debtors objected that the sum was unreasonable. The compromise

order was not approved as proposed and the ALC was directed to file a motion for allowance of its fees with supporting documentation. After that documentation was filed the IRS and the Chapter 12 Trustee joined the Debtors in objecting to the fees requested, now $30,000.00.

### B. 11 U.S.C. 506(b).[2]

■■■ ALC seeks an award of its attorneys fees and costs pursuant to 11 U.S.C. 506(b).

A creditor must satisfy four elements to be eligible for attorneys' fees under § 506(b): (1) the creditor's claim is an allowed secured claim; (2) the creditor is oversecured; (3) the fees are reasonable; and (4) the fees are provided for under the agreement.

*In re Kord Enterprises II,* 139 F.3d 684, 689 (9th Cir.1998) The parties herein dispute only element # 3, whether the fees are reasonable. This is an issue of federal law. *Ibid.*

### C. Reasonableness.

Courts have articulated a standard to be applied when considering allowance of secured creditors fees:

... [A] rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint in enforcement expenses.

*In re Continental Vending Machine Corp.,* 543 F.2d 986, at 994 (2nd Cir.1976).

■■■ The fact that the creditor has been billed and paid for the services is not determinative.

What is ultimately approved by the Court as reasonable and necessary does not necessarily equate to the same fees charged (and paid) between the attorney and the attorney's client. Such a fee is a contractual matter between the two. In the bankruptcy context, the allowed fees may be subject to variation where creditors' and debtors' funds are being disbursed to pay secured creditor claims. [*In re*] *Green Valley Beer,* 281 B.R. [253] at 255 [(Bankr.W.D.Pa.2002)], *citing In re Harman Supermarket, Inc.,* 44 B.R. 918, 919 (Bankr.W.D.Va.1984).

. . .

While oversecured creditors are entitled to engage counsel and pay for constant, comprehensive and aggressive representation, such creditor is not entitled to reimbursement for attorney fees for every action it takes claiming that its rights or interests have been affected. Where services are not reasonably necessary to protect its interests, or where action is taken because of a lawyer's excessive caution or overzealous advocacy, in exercise of their discretion, courts have the right and are duty-bound to disallow the fees and costs requested. *Green Valley Beer,* 281 B.R. at 258 (citations omitted); *In re Oliver,* 183 B.R. 87 (Bankr.W.D.Pa.1995)

*In re McGuier,* 346 B.R. 151 at 164–165 (Bkrtcy.W.D.Pa.2006).

■■■ Section 506(b) does not give an oversecured creditor "a blank check". *In re Dalessio,* 74 B.R. 721, at 723 (9th Cir. BAP 1987). As one bankruptcy court has stated:

**2.** "(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

The reasonableness requirement in Section 506(b) was intended to prevent creditors from "fail[ing] to exercise restraint in the attorneys' fees and expenses they incur, perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts." *In re Gwyn*, 150 B.R. [150] at 156 [(Bankr. M.D.N.C.1993)]; *see also In re Lund*, 187 B.R. 245, 251 (Bankr.N.D.Ill.1995). If proper restraint is not exercised, the costs of any "overlawyering" should be borne by the Creditor rather than Debtors. *In re Ward*, 190 B.R. [242] at 250 [(Bankr.D.Md.1995)].

*In re Staggie*, 255 B.R. 48, at 54 (Bkrtcy.Idaho 2000).

 The burden of proof on the reasonableness of an oversecured creditors' claim for attorneys is upon the creditor. *In re Atwood*, 293 B.R. 227, at 233 (9th Cir. BAP 2003).

The court in the case of *In re Beyer*, 169 B.R. 652 at 655 (Bkrtcy.W.D.Tenn.1994) listed a number of factors which it considered in determining the reasonableness of fees under § 506(b).

(1) the nature, extent, length and value of the services rendered;

(2) the bankruptcy and non-bankruptcy experience, reputation, and ability of the attorneys;

(3) awards in similar cases;

(4) the novelty and difficulty (or lack thereof) of the questions presented;

(5) the skill requisite to perform the legal services properly;

(6) the customary fee;

(7) professional time actually spent;

(8) amount involved in potential risk;

(9) the results of the cases;

(10) specialty in which the attorneys may be practicing;

(11) fees sought to be applied;

(12) distinction between partner and associates time;

(13) costs of comparable services;

(14) use (or lack thereof) of paralegals; and

(15) duplication of efforts;

This court will refer to a number of these factors in analyzing the fee requests in this case.

D. *ALC's Attorney Billing Practices.*

1. *Staffing*

ALC employed two law firms which assigned ten different lawyers (five attorneys per firm) to represent it in this matter. Lane Powell assigned one partner and four associates to the matter. Dorsey & Whitney assigned two partners and three associates to the matter. ALC has provided no explanation of the bankruptcy and non-bankruptcy experience, reputation and ability of any of the attorneys representing it. The vast amount of time expended on the matter by Lane Powell was by one associate. It is unclear what experience this associate had in bankruptcy matters, but a number of his time entries reflect that he was a novice in the area and needed guidance from his superiors in such fundamental matters as filing an appearance in the case.

In the case of Dorsey & Whitney it appears that the majority of time for which they seek compensation was performed by the partners.

The application and supporting pleadings submitted provide next to no guidance in regard to why the respective firms staffed this case in the way that they did. Nor is there any indication given as to why two law firms were employed.

2. *Hourly Billing Rates.*

Although ALC's attorneys billed it at substantially higher rates than are being

requested here, it is not seeking compensation at those rates from the estate. ALC has voluntarily reduced its request to what it refers to as "In District" rates of $200.00 per hour for partners and $160.00 per hour for associates. These rates are within the range of reason for legal services provided in bankruptcy matters in this district depending upon experience and expertise. There is nothing in this case that would suggest the need for expertise beyond that available in the district.

### 3. *Lumping.*

The court has analyzed the billing information provided by ALC's attorneys in support of the request for fees. This task has been made difficult by the attorneys failure to break down the specific tasks with corresponding time entries, rather they listed all the multiple tasks performed on a given day with one time entry. Bankruptcy courts have been almost universally critical of this practice:

> This type of billing practice is known in bankruptcy parlance as "lumping" and universally disapproved by bankruptcy courts for two reasons. One, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable. Two, it prevents the Court from determining whether individual tasks were

expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together. *In re Automobile Warranty Corp.*, 138 B.R. 72, 76 (Bankr.D.Colo.1991) (exhaustive list of citations omitted.)

*In re Staggie*, 255 B.R. 48 at 55 (Bkrtcy.Idaho 2000).

This practice of lumping was engaged in by both of ALC's law firms throughout the course of the case.[3] Lumping makes it impossible for the court to determine whether the time allocated to a specific task is reasonable. *In re Kelsey*, 272 B.R. 830 at 834 (Bkrtcy.D.Vt.2002) *In re NWFX, Inc.*, 267 B.R. 118, (Bankr. W.D.Ark.2001).

### 4. *Noncompensable Services.*

Compounding the problem of lumping is the problem that a number of seemingly simple administrative matters are included in the billing entries. These matters might commonly be performed by non professional staff or even employees of the creditor. For example, there are five different time entries from three different attorneys relating to preparation of a notice of appearance[4] a task commonly delegated to clerical staff.

██ Likewise there are six different time entries from two attorneys relating to preparation of the original proof of claim.[5]

---

**3.** An example of this is the following billing entry for August 12, 2003 of W. Krause representing 3.4 hours:

> Review file and Creditor's meeting notice re attendance at meeting of creditors for Wanecheck bankruptcy; coordinate review of notice of appearance and proof of claim form by S. Jahnke; coordinate inquiry re telephone conference ability of Yakima courthouse; forward draft proof of claim form (PDF format) to S. Casotti and D. Larsen for review (with e-mail correspondence/questions); review Eastern District Pacer site for docket entries and recent

activity on the Wanecheck filing; edit notice of appearance pleading and proof of claim document, create cover letter for proof of claim exhibits; coordinate filing of same; e-mail correspondence to B. Leaverton and S. Casotti re attendance at meeting of creditors, proof of claim form status, etc.

**4.** Time entries for July 22, 2003, July 28, 2003 and three entries for August 12, 2003.

**5.** July 22, 2003, July 22, 2003, July 28, 2003, July 29, 2003, August 12, 2003 and August 12, 2003.

It is not unreasonable to expect a creditors staff or non professional staff to draft the proof of claim form and furnish the documentation. *In re Staggie*, 255 B.R. at 56, FN6. The original proof of claim was on the official form and includes as attachments copies of the original documents. It is not clear why an unusual amount of time would be needed for this task. The time entries which reference this proof of claim total 6.4 hours but are lumped with other tasks. The court would be reduced to guessing if it tried to segregate these services by the specific task.

■ Another example of an area of concern relates to the time expended on the part of ALC's attorneys in relation to the closing of the real estate sale. The real estate had been auctioned on October 19, 2005, pursuant to a court order. Its sale was confirmed by court order on November 21, 2005, under which ALC's debt would be paid in full. Between November 21, 2005, and January 4, 2006, one of ALC's attorneys spent 12.3 hours on preparing reconveyance documents to clear title of the real estate from ALC's interest. A review of the 7 different entries in this period show that part of the difficulty was caused by the fact that ALC was unable to find the Debtors' original promissory notes for surrender. This is not a problem for which the Debtors or the estate should compensate ALC.

Another example of ALC's tendency to charge the Debtors' estate expenses which it should pay itself is found in the following two entries:

| | | | |
|---|---|---|---|
| 10/28/2004 | W. Krause | Receive audit letter to Moss Adams and draft initial partial response | 1.00 |
| 11/1/2004 | W. Krause | Work on audit letter response (includes in-house e-mail regarding request and disclosure issues, review of draft letters to client seeking information) | .60 |

6. "American Legend Cooperative's Motion for Allowance of Interest, Attorneys Fees and

These entries appear to relate to an audit of ALC itself and should not be paid for by the estate.

ALC also attempted to bill the estate for the lawyer admission fees to the Eastern District of Washington, which request was withdrawn during the course of this hearing.

### 5. *Duplication of Services.*

ALC changed attorneys midstream in this case. This, of course, would lead to a certain amount of duplication of services as the new firm familiarized itself with the case. ALC concedes that the Debtors' estate should not be compensated for that duplication. It then suggests that any such duplicative services were "(perhaps $1,000–$2,000 of time)".[6] It is not clear to the court as to how it should test the reasonableness of that estimate when examining the billing entries.

### 6. *Summary Re: Billing Practices.*

■ The material submitted in support of ALC's request for an allowance of attorneys fees is deficient. It does not provide the court with the information in a form in which the court can conduct a meaningful review of the reasonableness of the fees requested.

The court was not provided with the experience of any of the 10 attorneys who worked on the case. As a result, it cannot evaluate the reasonableness of the various firms' staffing decisions.

The practice of lumping different specific tasks in single entries makes it impossible to calculate the time expended on the specific tasks, and the reasonableness of the time expended on the specific task.

Costs under U.S.C. § 506(b)" Docket # 246, Part 1, page 8.

This is compounded by the inclusion in the time entries of tasks which are either non-compensable as to the estate or which could have been delegated to other less expensive providers.

As a result, the most scientific way to review the reasonableness of attorney fees, examining the experience of the providers, the reasonableness of their billing rates, and the time expended on the specific task is not available in light of the materials provided to the court. Since the applicants have made it clear that they did not want an evidentiary hearing but, rather, have it decided on the documentary material provided, the court must utilize other methods in making its decision.

## VI. *Decision*

■ Given the problems with the material provided in support of its fee request, the court is reduced to relying on his or her own experience. *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 856 (3rd Cir.1994).

This court has presided over this case since its inception. It has not been a particularly contentious case until the final fee dispute. The court notes that from the date of filing on July 1, 2003, to February 9, 2004, there was no need for a court hearing in the case. At that February 9, 2004 hearing, the court was advised that ALC was voluntarily striking the hearing on its motion to dismiss in light of the Debtors' decision to abandon their proposed operating plan and file a liquidation plan. Including this first hearing in the case, there were 11 hearings at which ALC appeared and was represented through the confirmation of the plan on September 1, 2005, and the sale of the Debtors' real estate by auction on October 19, 2005. At these hearings, which were essentially status conferences at which the parties advised the court of the progress in the case, the participation by ALC's attorneys was minimal, not exceeding one minute in any of the 11 hearings.[7] The problems posed in the case involved details concerning marketing and sale of the Debtors' real estate. These problems, to name a few, included the necessity to survey the property, remove structures (numerous mink pens), deal with environmental problems, and income tax liabilities resulting from the proposed sale of the property. These problems were ultimately resolved among the parties, with America West Bank and its counsel taking the laboring oar in financing the work needed and supervising the process. ALC's counsel kept its client advised of these actions, but did not appear particularly active in resolving these problems. There were no contested hearings regarding these matters in which ALC appeared significantly involved.

The relationships between ALC, the Debtors, the trustee, and the other creditors in the case were not particularly contentious until this fee dispute. The Debtors scheduled ALC's debt as undisputed within a few hundred dollars of the amount listed on ALC's original claim. The Debtors treated that claimed amount as what was owed throughout this case, through the payoff of ALC's principal and interest from the sale proceeds.

ALC objected to the Debtors' first plan (the operating plan) and moved to dismiss the case relying in part on the argument that the Debtors were ineligible for relief under chapter 12. When the Debtors responded by seeking a liquidation plan, ALC was seemingly satisfied and aban-

---

**7.** In preparing this decision, the court has reviewed the recording of each of these hearings.

doned its motion to dismiss without hearing.

All parties agreed that, throughout this case, ALC was oversecured. Although it was in second place behind America West Bank's mortgage, the Debtors' schedules reflected substantial equity to secure ALC's position and this has proved true with the sale of the real property collateral. Once a liquidation strategy had been agreed upon in the case, by the first hearing on February 9, 2004, ALC basically monitored developments. Although there has been some discussion during the course of the case as to disposition of ALC's personal property collateral, those concerns have dissipated over the course of the case. There were no complex legal problems. America West Bank took the lead in facilitating the efforts needed to get the real estate ready for marketing.

ALC was charged $47,862.21 by its attorneys for work in this case through February 28, 2006. Its original claim in the case was $48,521.40. The fees charged almost equal the original claim itself. The proportion of fees sought in relation to the total claim must be considered by the court. *In re McGuier*, 346 B.R. 151, 169 (Bkrtcy.W.D.Pa.2006). Even the $30,000.00 figure sought in this hearing is out of proportion to the underlying debt, the secure collateral position, and the uncontentious history of this matter. The court notes that America West Bank received $19,198.00 in compensation for its fees and costs in this matter and it played a more active role in the case.

Having steeped itself in the facts of this case, analyzing the documents submitted, and relying on its own experience of charges for comparable work in the district, the court concludes that a reasonable award to ALC for its attorney's fees and costs in this matter is $12,000.00.

The court will issue an order accordingly.